HEARD APRIL TERM, 1872.

## SULLIVAN vs. THOMAS.

The Supreme Court has jurisdiction, in "cases of Chancery," to review, on appeal, the facts of the case, and if error be found therein, to reverse or modify the judgment of the Circuit Court.

By the term "cases of Chancery," as used in Art. 4. Sec. 4, of the Constitution, declaring the jurisdiction of the Supreme Court, is meant such cases as were cognizable by the Courts of Equity of the State, existing at the time of the adoption of the Constitution.

What is meant by the term "case" in the Rules of the Circuit and Supreme Courts, and Code of Procedure, explained.

What is a "final judgment" in a "case of Chancery," from which an appeal may be taken, considered.

Appeal heard and decided in a "case of Chancery," upon the pleadings and exhibits, evidence, written and oral, taken by a Referee, the Circuit decree, and notice with grounds of appeal, returned into this Court by the Clerk of the Circuit Court as copied from the record on file in his office.

The facts of the case upon a question of fraud reviewed by the Supreme Court on appeal, and the decision of the Circuit Court finding that no fraud was proved, *held*, error of fact, and decree reversed.

BEFORE ORR, J., AT GREENVILLE, AUGUST EXTRA TERM, 1871.

Bill by James M. Sullivan and others, plaintiffs, against William M. Thomas, George W. Tolbert, John R. Tolbert, William Hickson and Martha Hickson his wife, T. Henry Stokes and Abigail Stokes his wife, George W. Collins, Anna Child, and others, defendants.

The brief, upon which the case was heard on the appeal, contained copies of the bill, answers and exhibits, the evidence, oral and written, taken by a Referee, the opinion and decree of the Circuit Judge, and the notice and grounds of appeal.

The questions made in the Supreme Court, and there decided, will be understood from the judgment of that Court; and the opinion and decree of the Circuit Judge, which is as follows:

ORR, J. The bill in this case was filed 26th July, 1869, to set aside certain receipts executed by James M. Sullivan, guardian, William Hickson and wife Martha, George W. Collins and wife, (now deceased,) to William M. Thomas, late Commissioner in Equity for Greenville, and to set aside and annul the receipt of T. Henry Stokes and wife Abigail, endorsed on the bond of defendants Tolberts, 31st October, 1865, "satisfied, so far as my wife's interest in this bond is concerned," and also their loose receipt for three thousand dollars in gold, in *satisfaction* of their claim on the bond of the Tolberts, and for account.

George W. Tolbert purchased at Commissioner's sale the Cambridge land of the "Shaw estate," for the sum of fifteen thousand one hundred and eighty-nine dollars, containing 915 acres, on the 6th day of February, 1861, payable in two equal annual installments, with interest. He gave his bond for the purchase money, with R. R. Tolbert, his father, and John R. Tolbert, his sureties. George W. Tolbert, the principal in the bond, (now deceased,) filed his answer to the bill 9th November, 1869, to which reference may be made, and which has been adopted by John R., the administrator.

The last installment of the bond fell due 6th February, 1863, and at least one of the parties in interest (Collins) desired that the bond should be paid. Thomas, the Commissioner in Equity at that time, wrote to Tolbert. After a correspondence between them, George W. Tolbert requested Thomas to advance the money due on the bond, and that he would reimburse him for such advance by the sale of cotton he then had on hand. The money due on the bond (or nearly all of it) was advanced by S. Thomas, the father of the Commissioner, and on the 6th of February, 1863, Thomas paid to Collins and wife four thousand five hundred dollars, and, by receipt of same date, to Hickson and wife four thousand five hundred dollars, and on the        day of            , 1863, to Dr. James M. Sullivan, the sum of $606.31, and on the        day of June, 1863, to Dr. James M. Sullivan, as guardian, the sum of $1,132.66, making the aggregate paid to him in his own right and as guardian, the sum of $1,738.97.

These payments nearly extinguished the interest which the above named parties had in the bond. After the payment there remained due to Collins and wife $139.93 ; to Hickson and wife $139.93 ; and to Dr. Sullivan and his wards the sum of $249.51. No payment was made in satisfaction of the interest of T. Henry Stokes and wife (the only other distributees) till after the war. He agreed to receive Confederate money from Thomas for his wife's interest, but after the money had been raised by Thomas, Stokes refused to receive it from him, and no payment on his wife's interest was made until after the termination of the war ; when they received from Tolbert $3,000 in gold, equal (in October, 1865,) to $4,800 in United States currency, in full satisfaction of his wife's interest in the Tolbert bond.

The facts found in this case are, that the arrangement made between George W. Tolbert and William M. Thomas, late Commissioner in Equity, was fair, upright and bona fide ; that Tolbert ap-

plied to him to advance the money to the heirs of the "Shaw land" for him on the bond; that he advanced to George W. Collins and wife the sum of $4,500; to William Hickson and wife $4,500; and to James M. Sullivan, individually and as guardian, $1,738.97; leaving due to the above parties only the sums heretofore set forth. That the above parties all received the money from Thomas, gave him unconditional receipts for the same, and used it; that these receipts are all dated in 1863, and that the present bill to cancel them was not filed till 1869.

That Collins and Hickson were importunate to have the Tolbert bond collected as soon as due. That no fraud, imposition or misrepresentation was practiced by Thomas on Collins, Hickson, or Sullivan; that they received the money with full knowledge of the fact that he was advancing it for G. W. Tolbert, principal in the bond; that the claim now set up by Sullivan, Collins and Hickson is an after thought, which would never have been conceived if Confederate money and bonds had not become valueless; that when they received the money their receipts were given for the several sums specified, and extinguished their respective interests in the Tolbert bond to that extent. That no collusion has been found between Thomas and Tolbert, to injure or defraud the parties having interest in the Tolbert bond; nor are any of the acts of Thomas in the whole affair proved to be *mala fides;* that Thomas, at the July Term of the Court for Greenville, 1863, the first Court held after the arrangement made with his father, reported the same, exhibiting the payments to Sullivan, Hickson and Collins, and the assignment of the bond to his father, S. Thomas; that it was a public and official report, and silences the complaint and clamor of Sullivan, Hickson and Collins, that they had no cognizance that the money was raised otherwise than by payment by the Tolberts; and that they slept on their rights from July, 1863, to July, 1869, when this bill was filed. That Thomas, having advanced or procured the advancement of $10,738.97, and procured, in good faith, receipts of the parties above named for that amount, proceeded to make a settlement with George W. Tolbert, the principal in the bond; upon which settlement, on the 31st Oct., 1865, Tolbert paid him the sum of $2,600 in gold, equal at that time, to $4,160 in U. S. currency, in full satisfaction of the money advanced by or through Thomas, to pay Hickson and wife, Collins and wife, and Sullivan, guardian.

As to T. Henry Stokes' demand to have the settlement between himself and G. W. Tolbert opened on the grounds of fear, fraud

and misrepresentation—a settlement made 31st Oct., 1865, when he signed a receipt on the bond, acknowledging satisfaction of the bond so far as his wife had an interest in it, and the joint loose receipt of himself and wife for the sum of three thousand dollars in gold, in satisfaction of her interest in the bond—it is even more preposterous than that set up by the other parties interested in the bond. The facts found with reference to his claims are, that George W. Tolbert paid him and his wife the sum of $3,000 in gold, equal in U. S. currency to $4,800, on 31st Oct., 1865 ; that in consideration that it was paid in cash, without hazard, litigation or expense, they accepted it in full satisfaction of the wife's share or interest in the bond of Tolbert ; that no fraud or misrepresentation was practiced upon him by either of the Tolberts ; that before accepting their offer, he went to Abbeville and informed himself of the pecuniary condition of the Tolberts ; and being thus informed, he accepted the offer, expressed himself well satisfied with the arrangement before and after the money was paid, and congratulated himself on receiving on the bond a sum so much greater than that paid to the other parties in interest in Confederate money in 1863 ; that the compromise was fair and honest when made ; that T. H. Stokes was not put in fear to make the settlement, and that neither fraud nor misrepresentation were practiced upon him. It is further found that there remains due and unpaid to Collins and (then wife) now step-daughter, Anna Child, on bond, $130.93, with interest from the 6th February, 1863, one-third thereof to Collins and two-thirds to Anna Child ; the same amount to Hickson and wife, with interest from same time ; to Dr. J. M. Sullivan, in his own right, $56.53, and as guardian of all his children, $193.04, with interest on same from 6th February, 1863.

It is, therefore, adjudged that the defendant, John R. Tolbert, as administrator of the estate of George W. Tolbert, pay the parties aforesaid the said sums of money remaining unpaid on the bond of G. W. Tolbert, with the interest thereon ; the payments to be made from the assets of the estate of said G. W. Tolbert, and if insufficient, then to be paid by the said John R. Tolbert, as executor of R. R. Tolbert, and by the said John R. Tolbert, in his own right. It is further adjudged, that T. Henry Stokes and wife, Abigail, have been fully paid and satisfied the interest of the said Abigail in the bond of George W. Tolbert, and that the settlement made by them with said Tolbert is final and conclusive, and that they are not entitled to have the settlement opened, or to the relief prayed for, and

that the bill, as to said T. Henry Stokes and wife, be dismissed at their costs. It is further adjudged, that John R. Tolbert, administrator of G. W. Tolbert, pay the remaining costs in this case.

The plaintiffs gave notice of appeal, as follows:

The plaintiffs give notice to the defendants and their attorneys, and to Wm. A. McDaniel, Esq., Clerk of said Court, that the plaintiffs appeal from the decree of Hon. James L. Orr, in this case, filed 16th October, 1871, and will make their motion at the next sitting of the Supreme Court in Columbia, to modify the same so far as it disallows their claim to rescind the receipts given by the said James M. Sullivan to the defendant, Wm. M. Thomas, and to hold the obligors of the bond given by George W. Tolbert, R. R. Tolbert and John R. Tolbert, responsible for the full share of the said James M. Sullivan, in his own right, and as guardian of his said children, in said bond, to wit: One-fourth part of one-half of the principal and interest of said bond amongst them, on the following grounds:

1. Because the said Wm. M. Thomas, whilst Commissioner in equity, executed, without any authority whatever, the pretended and fraudulent assignments endorsed on said bond, respectively, first to S. Thomas and then to Wm. M. Thomas, and again to Wm. M. Thomas, as attorney of S. Thomas, and said assignments being in fact and law fraudulent, could confer no rights whatever on the respective assignees, nor could they authorize the obligors of said bond to pay any portion of said bond to said assignees, or either of them; and that in fact the said obligors never paid said Wm. M. Thomas, whilst Commissioner, any part of said bond, except the two first credits endorsed thereon, to wit: One of $676.70, and the other of $322. And the said obligors are liable to pay the entire balance of said bond, deducting the $3,000 they paid to T. Henry Stokes and wife.

2. Because the allegations of the bill, that William M. Thomas falsely and fraudulently misrepresented to the complainants and the other parties entitled to the proceeds of said bond, that the Tolberts paid him said bond in Confederate money, was fully proved by the testimony in the cause, and the said obligors, with a full knowledge that they had not made said payment, and had not authorized him to do so, adopted the fraud of said William M. Thomas, and in fraud of plaintiff's rights proceeded to make payment to him to the extent of $2,600 in gold and four bales of cotton, after Thomas was out of office, and they should have been held liable for said

payments, as well as the balance of said bond, less the $3,000 paid to T. Henry Stokes and wife.

3. Because the said bond, in law and in fact, to the extent before indicated, should, under the proof in the case, have been regarded and treated by the Court as due and unsatisfied, and the obligors liable therefor.

4. Because, it is respectfully submitted, that the decree of the Court, to the extent complained of, is not only without evidence, but is in opposition to it and the law of the case.

*Sullivan & Stokes*, for appellants :

1. Wm. M. Thomas, as Commissioner in Equity, was a public officer, and, as such, subject entirely to the order and direction of the Court, as to the bonds and other choses in action in his office, and any disposition of them for his own benefit, or that of others, than the parties to whom in equity they rightfully belonged, was in law and fact fraudulent.

" Whenever a Master or Commissioner takes charge of funds or estates under an order or decree of Court, he shall be held to act officially ; and the sureties to his official bond will be liable for his acts, unless he has, by an order or decree of the Court, been appointed Receiver, and has given bond and security, as required by the A. A. of 1824."—*Lowndes* vs. *Pinckney*, 1 Rich. Eq., 155.

" Where a Commissioner took a bond, payable to himself, for property sold by him under decree of the Court, and retained the bond more than twenty days after the date of his successor's commission, and received payment thereon after he went out of office : *Held* that the failure to deliver the bond to his successor was a breach of the condition of his official bond, and that his sureties were liable for the amount of such payment."—Ibid.

" The annual reports and accounts of the Commissioner conclude nothing as to the rights of the parties whose estates or funds are accounted for."—*Jackson* vs. *McAliley*, 5 Rich. Eq., 38.

The duties and privileges of a Master expire with his term of office. Sales ordered, but not made, his successor must make, and the officer who makes the sale is entitled to the commissions.—*Keith* vs. *Gray*, Rich. Eq. Ca., 227.

A Commissioner in Equity, in suing out letters of administration on a derelict estate, under the Act of 1857, acts officially, and when he ceases to be Commissioner, he ceases to be administrator. If no

one else should apply, his successor should sue out letters of administration *de bonis non.*—*Levi* vs. *Huggins,* 14 Rich., 167.

The Statute of Limitations does not run in favor of a Master against an account for proceeds of property sold by him in his official character, until a demand on him by the party entitled, or notice by him that he holds adversely; at least the plea of the Statute will not avail when the Master has been directed to apply the proceeds to the maintenance and education of the complainant, and to re-invest the surplus. So that he was, in fact, trustee.—*Houseal* vs. *Gibbes,* Bail. Eq., 482.

That, within twenty days after a successor in office to any Master, Commissioner or Register shall have been elected or appointed, and shall have received his commission, and entered upon the duties of his office, such Master, &c., shall likewise pay over, transfer and deliver to his said successor all moneys, *bonds, notes, certificates of stock and other choses in action or property,* held by such Master or Commissioner by *virtue of his office.*—See 26th Section of the Act of 1840, to define and ascertain the powers, duties and liabilities of Masters, Commissioners and Registers in Equity, &c.

Not to practice in Court of Equity, or with a partner in Court of law.—33d Section of same Act.

Sheriff or Deputy Sheriff shall not purchase property sold by them officially; on conviction thereof, shall be deprived of his office, fined and imprisoned, at the discretion of the Court, and *such purchase shall be null and void.*—See 69th Section of the Act of 1839 concerning the office, duties, &c., of Sheriff.

Where the Sheriff has advanced money to the plaintiff on an execution in his office, with an understanding that he was to be reimbursed when the execution was collected: *Held,* That the execution was satisfied, and that neither the Sheriff, nor any one else, could afterwards use it to enforce any claim against the defendant.—*Martin* vs. *Goudy,* 1 Hill, 417.

Defendant, a Commissioner in Equity, having funds of the Court to the amount of about $1,600 in his hands, was ordered by the Court to invest the same at interest, on good personal security. One M. owed the defendant on his private account about $1,000, and defendant, as Commissioner, loaned M. the $1,600 on bond and personal security, retaining, by M.'s offer, out of that sum, the amount that M. owed him. M. and his security afterwards became insolvent, and nothing could be collected on his bond: *Held,* That the defendant had not invested the $1,600 in conformity to the

order of the Court, and that he was liable for the whole amount thereof, with interest.—*Mulligan* vs. *Wallace*, 3 Rich. Eq., 111.

Where choses belonging to suitors are in the hands of the Master, it is the duty of the parties, and not of the Master, to have proceedings instituted for their collection; and where a minor is the party interested, it is the duty of his guardian to see to their collection.—*Wightman* vs. *Gray*, 10 Rich. Eq., 518.

2. That the conduct of Wm. M. Thomas, in attempting to dispose of said bond of the Tolberts, either to his father, S. Thomas, or to himself, without the order and direction of the Court, and for his benefit, or that of his father, was *ipso facto* a fraud, and void, and conferred no rights whatever, either as to himself, his father, or the obligors of said bond.—*Lowndes* vs. *Pinckney*, 1 Rich. Eq., 155; *Mulligan* vs. *Wallace*, 3 Rich. Eq., 111; *Clark* vs. *Deveaux*, 1 S. C., 172.

3. That it is manifest, from the whole testimony in the case, that the Confederate money that Wm. M. Thomas paid to the complainants and other parties in interest was not paid to him by any of the Tolberts, but was falsely represented by him to the parties who received it, to have been paid by them, and that they would not have received it, if they had not been misled and deceived by such representation.

The answer of G. W. Tolbert, as to authorizing Thomas to advance money, not responsive, and no evidence, and contradicted by R. R. Tolbert's letter.

The assignment by its own terms stating net amount of funds collected is false, as the debtors had paid nothing. See assignment on bond.

So much of the answer as relates to request of Tolberts to advance, not evidence—not being responsive to bill.

"The " annual reports and accounts of the Commissioner conclude nothing as to the rights of the parties whose estates or funds are accounted for."—*Jackson* vs. *McAliley*, 5 Rich. Eq., 38.

4. That when the Tolberts were aware that they had not paid anything upon their bond except the two sums endorsed thereon, as stated in the first ground of appeal, and then proceeded to avail themselves of Thomas' illegal and fraudulent act, they acted in their own wrong, and could acquire no right or benefit by it, and their bond remained unsatisfied to the extent complained of in this appeal.

Established by R. R. Tolbert's letter aforesaid, who was agent of

the obligors, as well as party ; also testimony of James P. Moore, as to tender of Confederate money, &c., to him. " Though one cannot be punished for the fraud of others, he cannot avail himself of it."—*Farr* vs. *Sims*, Rich. Eq. Cas., 122 ; *Miller* vs. *Tollison*, Harp. Eq., 170, as to effect of fraud.

5. So much of the evidence relied on by His Honor based on or derived from the answers of G. W. Tolbert and William M. Thomas, as well as what James P. Moore proved as to what G. W. Tolbert told him after settlement with Thomas, was incompetent.

If the defendant, in addition to his answers to the matter concerning which he is interrogated by the plaintiffs, sets up other facts by way of defence, his answer is not evidence for him in proof of such new matter, but it must be proved *aliunde*, as an independent allegation.—3 Green. Ev., § 290. The answer is limited to those parts of it which are strictly responsive to the bill. The testimony of one witness is sufficient to prove fraud, although denied by the answer, if corroborated by the circumstances of the case.—*Rowe* vs. *Cockerell*, Bail. Eq., 126. See, also, *Martin* vs. *Sale*, Bail. Eq., 1 ; *Magwood* vs. *Lubbock*, Bail. Eq., 382 ; *Johnson* vs. *Slawson*, ibid, 463.

*New Trial.*—" The Court will grant a new trial if the verdict be clearly against evidence."—*Hudson et al.* vs. *Williamston*, 1 Tr. Con. Rep., 374.

A verdict clearly contrary to evidence set aside, and a new trial granted.—*Cockfield* vs. *Daniel*, 1 Mill, 193.

The Court will grant a new trial, *toties quoties*, where the verdict is contrary to law, and where there is no evidence on which the jury can form their verdict.—*Turnbull* vs. *Rivers*, 3 Mc., 51.

This Court will grant a second new trial where the verdict is manifestly against the evidence, and always when it is against the law.—*Smith* vs. *Hill's Executor*, Columbia, December, 1829.

Where the evidence is all on one side, and is neither impeached or questioned, if the jury find against the evidence, a new trial will be awarded, although the presiding Judge certify that he has no reason to find fault with the verdict.—*Furman & Smith* vs. *Peay*, 2 Bail., 394.

A new trial was ordered, when the Court were unable to perceive how the jury could have drawn, from the evidence before

them, the conclusion upon which they based their verdict.—*Rucker* vs. *Frazier*, 4 Strob., 93.

*Arthur & Arthur, Perrin & Cothran*, for Thomas.

*Easley & Wells*, for Hickson, Collins and Stokes.

*Earle*, for Tolbert, contra.

In the argument of this appeal for the respondents, we propose to discuss the following propositions :

I. The appeal cannot be maintained on the pleadings, because :

1. There is no case made.

2. There is no judgment filed.

II. The "facts" having been found by the Circuit Judge, there is no such error of law as to warrant a change of the decree.

III. If the Court should hold the appeal maintainable, the decree is sustained by the evidence.

As to the first proposition—

1. No case is made.

The counsel has contented himself by putting in his brief the pleadings and testimony, and the decree of the Court, adding thereto some general statement of opinion as to the law and the facts of the case, as "grounds of appeal." But let us see what the law requires, and test his "grounds of appeal" by the standard of its requirements.

The 55th Rule of Court requires that when it is intended to review by appeal a trial by the Court, "a case, or exceptions, or case containing exceptions," shall be prepared by the party intending to review the trial, and prescribes the manner in which it shall be done. Rule LVI reads as follows :

"Exceptions shall only contain so much of the evidence as may be necessary to present the questions of law upon which the same were taken on the trial ; and it shall be the duty of the Judge, upon settlement, to strike out all the evidence and other matters not necessarily inserted."

"It seems that, to entitle a party appellant to review any questions, either of fact or of law, arising upon the trial, or upon the decision, where the action is tried by the Court without a jury, or by a Referee, a case, or exceptions, which is the same thing under the Code, regularly settled and filed, and made a part of the papers presented to the Court, is indispensable."—Supreme Court, 1858 ; *Conoly* vs. *Conoly*, 16 Howard Pr. R., 224.

A copy of the case, as settled, *must* be filed."—*Parker* vs. *Link*, 26 Howard Pr. R., 375.

" The Supreme Court, in reviewing, at general term, a judgment entered upon a report of a Referee, or upon a trial before a Judge without a jury, acts purely as an Appellate Court, and their review cannot be had, except on a case containing the findings upon the law and fact, with the exceptions inserted. The case should be p:esented in the precise shape required by the Court of Appeals. The case is to be single, and made up as though the findings and exceptions were had on the trial—the exceptions, in their proper order, following the findings. Where the review is upon the facts, it is essential that the findings of the Referee upon the facts be explicit, and cover all the material facts in the case."—Supreme Court, 1860 ; *Rogers* vs. *Beard*, 20 Howard Pr. R., 282.

" A case on appeal to the Court of Appeals should present, with legal and logical precision, the questions which are to be examined in that Court, and should contain nothing else."—Court of Appeals, 1859 ; *Bissel* vs. *Hamlin*, 20 N. Y., 519.

" A statement of facts proved, and of the conclusions of law, separately, must be inserted *in the case.*—16 N. Y., 610 ; Id., 613 ; Id., 117 ; 3 Kern., 344. The report of a Referee (although required by Rule 32 of the Supreme Court to state his conclusions of fact and of law separately,) will not be accepted by the Court of Appeals for a case."—Ib.

" If the case contain no exception, this Court cannot review it."— Ct. of Appeals, 1867 ; *Douglass* vs. *Day*, 3 Keyes, 434.

Not only is this the law, with all the presumption of reasonableness and necessity in its favor, but these are manifest. This is a Court for correction of errors of law, and it only wants so much of the facts of the case as are necessary to exhibit to the Court the mistake of the law, or to manifest its misapplication. If the learned counsel desires to show this Court that the Circuit Judge has committed an error of law, he should have presented us a statement of facts found by the Court, upon which he was willing to rely, as showing a misapplication of law. If we had allowed this as correct, it should then have been settled by the Judge ; or, if we amended, he should have allowed or corrected, and then referred to the Judge. By following this simple legal requirement, the facts upon which counsel are content to rest their case are concisely and authoritatively presented to this Court. Ignoring the law, and the reason for it, he throws before

the Court all of the facts, for a general review, and, having done this, his grounds of appeal are equally comprehensive. The "first" alleges that the assignments made were, "in fact and in law, fraudulent," whereas the Circuit Judge found, as "a fact," that this transaction "was fair, upright, and *bona fide.*" The "second" alleges that William M. Thomas "falsely and fraudulently misrepresented to the complainants, and other parties entitled to the proceeds of said bond, that the Tolberts paid him said bond, in Confederate money, was fully proved by the testimony in the cause," whereas His Honor the Circuit Judge *finds, as a "fact,"* that no fraud, imposition or misrepresentation was practised by Thomas on Collins, Hickson or Sullivan. The "third" is, that the bond, "in law and in fact," "under the proof in the case," should have been regarded as due and unsatisfied. And the "fourth" is, that the decree "is not only without evidence, but is in opposition to it and the law of the case." Now, we respectfully submit to the Court that these "grounds," instead of presenting *errors of law* for the correction of the Court, are simply a rhetorical statement of the appellants' view of the case, for the purpose of opening up the points for a new trial, by way of a review.

"Where the Court is substituted for triers, its determination of the facts cannot be excepted to, and is final. But its decision of the question of law on the facts may be excepted to, and brought under review on error."—Supreme Ct., Chambers, 1858; *Stout* vs. *People*, 4 Park Cr., 132.

2. No judgment is entered.

Appeals lie to this Court from final judgments, or some final order ending the case. The decree of His Honor the Circuit Judge is not a judgment upon which an appeal may be based; and a judgment should have been entered and filed.

"An appeal from a judgment, before judgment is complete and perfect, so as to be capable of execution, is premature, and must be dismissed."—N. Y. Superior Ct., 1851; *Lentilhon* vs. *Mayor, &c., of N. Y.*, 3 Sandf., 721.

[The counsel also cited *Austin* vs. *Kinsman*, 1 S. C., 101, and cases there referred to. He then reviewed the evidence, and contended that the conclusions of the Circuit Judge were right both upon the law and the facts.]

Sept. 12, 1872. The opinion of the Court was delivered by

WILLARD, A. J. The bill in this case was exhibited by J. M.

Sullivan and others, as claimants, to part of a sum of money secured by a bond to the defendant, W. M. Thomas, as Commissioner in Equity of Greenville District, taken on the sale of lands by such Commissioner, under a decree for partition. At such sale the defendant, G. W. Tolbert, became the purchaser.

The bill prays an account as against W. M. Thomas, G. W. Tolbert as principal, and J. R. Tolbert, as security thereon, and also as executor of R. R. Tolbert, deceased, his co-surety. The parties originally entitled to the balance of the money secured by the bond, over and above that part claimed by the complainants, are made parties defendant.

The bond in question was executed by G. W. Tolbert, Robert R. Tolbert and J. R. Tolbert, payable to W. M. Thomas, Commissioner in Equity for Greenville District, and bears date, February 6, 1861. It is conditioned for the payment by G. W. Tolbert to W. M. Thomas, Commissioner, or his successors or assigns, the sum of $15,189, "in one and two equal and successive installments," with interest from its date. It was delivered to and held by the defendant, W. M. Thomas, in his official character as Commissioner in Equity.

Two payments, endorsed upon the bond, appear to be undisputed. One is for $676.70, made February 6, 1861, and the other for $322, made February 10, 1863.

There are two other receipts endorsed upon the bond, the first of which is affected by the present controversy. They are, in words and figures, as follows:

"GREENVILLE, S. C., 31st October, 1865.

"Received of G. W. Tolbert, on this bond, the sum of twenty-six hundred dollars in gold, in full payment of my interest in the matter of the shares of Hickson and wife, Collins and wife, and James M. Sullivan.

"W. M. THOMAS."

"Satisfied as far as my wife's interest in this bond is concerned.
"T. HENRY STOKES.

"October 31, 1865."

The questions at issue on the pleadings are, whether the bond has been paid and satisfied, wholly or in part, as between W. M. Thomas, or his successor, and the obligors, and whether W. M. Thomas is liable to account to the complainants for money received upon said bond, and not accounted for.

The decree of the Circuit Court holds that the bond has been paid, with the exception of certain specified sums which remain due to the parties.

The present appeal involves the enquiry, whether there is not due on the bond, as against the obligors, a larger sum than that ascertained to be due by the decree.

The respondents raise certain questions as to the power of this Court to enquire into matters of fact found by the Circuit Court, and also involving the regularity of the appeal, and the sufficiency of the appeal papers, that will be considered before passing to the consideration of the questions of fact raised by the appeal.

The first point made by the. respondents is, that the appeal cannot be maintained because there is no case made and no judgment filed.

The respondents have cited in support of this proposition the 55th and 56th rules of the Circuit Court, and several decisions of the Courts of New York. These authorities cannot be understood in their bearing on the point made, unless a distinction, affecting the powers of this Court, is attended to, of which respondents appear to have lost sight.

The Supreme Court of this State is a Court for the correction of errors at law, having appellate jurisdiction only in cases of Chancery.—Const., Art. 4, Sec. 4.

What is meant by appellate jurisdiction as contradistinguished from jurisdiction to correct errors at law? What is the class of cases described by the expression "cases of Chancery," as employed by the Constitution?

The answer to these questions will explain a matter frequently misunderstood.

The fact that a Court for the correction of errors at law, as distinguished from one possessing general appellate power, was unknown in this State prior to the Constitution of 1868, accounts for the misapprehension that has existed in many minds as to the precise character of the jurisdiction of this Court.

The change that was affected in the jurisdiction of the Court of last resort was noticed in the *State* vs. *Bailey*, 1 S. C., 1.

What was meant by the expression, "appellate jurisdiction," as employed by the Constitution, must be determined with reference to the fact, that such a jurisdiction was known in the State, as possessing certain characteristics at the adoption of the Constitution, and was in exercise by the Courts displaced, and had been so exer-

cised for many years previous thereto. The jurisdiction of the Court
of Appeals was of that character. That Court had authority to re-
view the decision of a Circuit Judge or Chancellor, as to any mat-
ter of law or fact decided by him. It also had authority to set aside
the verdict of a jury on any ground that affords to a Court of origi-
nal jurisdiction authority to set aside such a verdict. In the exer-
cise of such jurisdiction it was governed by fixed principles. It
would not disturb the decision of a Judge as to a question of fact
when the determination of the fact rested upon doubtful or disputa-
ble proofs, but sustained the conclusions of fact of the Court below,
unless clearly erroneous.

But, although, this and similar limitations were to be considered in
the exercise of the powers of the Court of Appeals over judgments,
decrees and verdicts, still so far as the question was one of jurisdiction
merely, it may be affirmed that that Court had authority to set aside
any conclusion of law or fact, whether made by a Circuit Judge, a
Chancellor, a jury, a Referee, or a Commissioner, on the ground either
of error of law or fact.

All this was embraced in the idea of appellate jurisdiction, as
that term was understood at the adoption of the Constitution.

Article 4, Section 4, denies this power to the Supreme Court, in
the amplitude in which it was enjoyed by the Court of Appeals,
limiting it to " cases of Chancery." In all other cases, except those
embraced within the original jurisdiction of the Court, such as
*mandamus* and the like, and " cases of Chancery," this Court was to
act as a Court for the correction of errors of law alone.

In order to ascertain the limits of our authority under this grant
of jurisdiction, we have only to ask what are errors of law? To de-
termine what is an error of law, capable as such of being corrected
in a Court for the correction of errors at law, we must have re-
course to the decisions of Courts of that class in England and the
United States. It is not necessary, in the present case, to consider
that question farther, for, as will be seen, the power we are called
upon here to exercise is part of the appellate power reserved by the
Constitution to the Supreme Court in "cases of Chancery." It
may be said, however, that errors of fact, or wrong conclusions of
fact, drawn from proofs or evidence, are not embraced within the
term "errors of law," but belong to a distinct category, namely,
errors of fact.

The jurisdiction and powers of this Court are as full as those of
the late Court of Appeals and Court of Errors, as it regards

35

"cases of Chancery." It can revise any decision on the ground of errors of law or fact. It is, therefore, necessary to understand what cases are embraced within the expression " cases of Chancery."

It must be premised that the jurisdiction of this Court, so far as it was ascertained and fixed by the Constitution, is unaffected by the provisions of the Code of Procedure or any other statute law. Again, the terms employed to mark out that jurisdiction must be taken in the sense in which they were understood at the time the Constitution was adopted.  Thus, for instance, the term " cases of Chancery," at that time, meant cases of a class of which the Court of Chancery could entertain jurisdiction, although since that time the Court of Chancery has been abolished and its jurisdiction conferred upon the Court of Common Pleas, yet what was intended to be described as " cases of Chancery" then, must be determined now, not with reference to the present state of jurisdiction and forms of procedure, but by the enquiry whether any given case could have been regarded, at the adoption of the Constitution, as a " case of Chancery."

When the nature of the right in controversy, or of the relief sought in any case is such that, prior to the Code, it would have been appropriately pursued in the Court of Chancery, it will be regarded as within the expression " cases of Chancery," and under the appeal given by the Code this Court will exercise over such case a jurisdiction to correct errors both of fact and law.   The circumstance that forms of proceedings, as it regards law and equity, are assimilated under the Code, does not affect the jurisdiction of this Court as established under the Constitution ; but we look to the substantial character of the controversy before us for the purpose of ascertaining the extent of our powers in relation to such case, rather than to the nature of the Court from which the case comes, in the technical mould into which the case is cast.

To avoid confusion of terms, it is proper to remark that the term " appeal," as used in the Constitution, bears a different signification, in some respects, from the same term as employed by the Code. The Code applies the term " appeal" to the proceeding by which any judicial determination is carried from an inferior to a revisory jurisdiction.   Whether the powers of the revisory tribunal in the given case are those of a Court for the correction of errors at law, or those of an appellate tribunal, as understood in the sense of the Constitution, the steps by which the Court is reached are, in the sense of the Code, an appeal.

As against the jurisdiction established by the Constitution, the Code could not convert this Court into an appellate Court in the sense understood by the Constitution, nor has it attempted to effect such a change.

Under the view presented above it is unimportant to refer to the fact that the present suit was commenced by bill in the former Court of Chancery, for had it been commenced under the Code, the nature of the case and of the relief sought would have brought it within our jurisdiction to correct errors of fact in cases of Chancery.

It is essential to have in view the foregoing distinctions as to the nature of our jurisdiction and powers, in order to ascertain what is meant by a " case," as that term is used in Rules 55, 56, 57 and 59, of the Circuit Court.

As the use of the word " case," in its technical sense, as applied to the statement of the proceedings upon the trial of an issue of fact, is new in this State, it may be advantageous to fix the sense in which that term is used in the Rules above mentioned. The term " case " is used in three distinct senses in the Rules of the Supreme and Cir- cuit Courts, and in common speech. It is used in the most general sense as the equivalent, merely, of cause or suit, as describing the subject-matter of a proceeding in a Court of Justice. Again, in a technical sense, as employed in the Circuit Court Rules above enume- rated, where it signifies a statement of the proceedings on the trial of an issue of fact. There is still a third sense in which the same term is used, an instance of which occurs in Rules 5, 7 and 8, of the Supreme Court. As used in the last mentioned Rules it describes the paper book made up for the use of the Supreme Court, contain- ing all proceedings in the Court below necessary to the understand- ing of a matter to be submitted to the judgment of the Supreme Court, and the proceedings taken by way of appeal to bring the case into the Supreme Court.

It is only with the term " case," as used in the Circuit Court Rules, also enumerated, that we have to do with in the present case.

To meet the objection, that no case has been made to authorize a review, it becomes necessary to ascertain what is essential to a case, as contemplated by the 55th Circuit Court Rule. Section 354 of the Code makes it the duty of the appellant to cause a copy of the judgment roll to be transmitted to the Appeal Court. Section 315 defines what shall constitute a judgment roll, as follows: " 1st. In case the complaint be not answered by any defendant, the sum- mons and complaint, or copies thereof, proof of service, and that

no answer has been received, the report, if any, and a copy of the judgment. 2d. In all other cases, the summons, pleadings or copies thereof, and a copy of the judgment, with any verdict or report, the offer of the defendant, exceptions, case, and all orders and papers in any way involving the merits and affecting the judgment."

The judgment roll of the Court below, evidenced by the proper certificate of the Clerk of such Court, is what the Supreme Court acts upon. Nothing extrinsic to the judgment roll can be brought before this Court, as a ground of impeaching any judgment of the Circuit Court. Of course this remark is inapplicable to the case of an appeal from an order, when the matter to be considered is not evidenced by a judgment roll.

It will, therefore, be observed, that in the case of an appeal from a judgment, whatever is relied upon, in order either to impeach or support such judgment, must, in the first instance, go upon the record of the Court below, and become part of the judgment roll, and must be transmitted to the Supreme Court as part of such judgment roll.

The judgment roll being the proper evidence of the proceedings of the Court below, in the case of an appeal from a judgment, the roll should contain all that is essential to a review of the judgment.

Before the blending of legal and equitable jurisdictions, the term " case " was applied to the narrative of the proceedings on the trial of an issue of fact, at *nisi prius*, on which a motion to set aside or enter a non-suit, or for a new trial, either for error of law or fact, or both, or for other appropriate relief, could be made, in a Court of original jurisdiction. It embraced the testimony and any verdict found upon it, any motion for a non-suit and the order made upon such motion, and any exception taken to such order. If matter of law was to be considered, on the motion for a new trial, the rulings or charge complained of were introduced, and the fact invariably noted, in respect to each separate ruling and each specific matter charged that was a subject of objection, that the party prejudiced thereby excepted in time to such ruling or charge. If the error complained of was, that the Judge refused to charge a proposition of law to which his attention was specifically called, such fact was set forth and a note made that the party aggrieved gave notice in time of an exception to such refusal to charge.

A statement thus prepared, containing the evidence, or facts

proved, the rulings and charge of the Judge, and the exceptions thereto, is what is described in Rule 55 of the Circuit Court as a "case containing exceptions."

The Code extended these modes of setting forth the matter to be reviewed to proceedings in equity. The term "case," as used in the Code, describes a statement of the proceedings on the trial of an issue of fact, whether tried before a jury, or before Referees, or before the Court; embracing proof, oral or written, and the verdict, finding, report or decision thereon.

If matters of law and fact are to be considered together upon it, then it should be what has already been described, a case containing exceptions. If matters of fact are alone to be considered, the exceptions are omitted. If matters of law are alone to be considered, then it is only necessary that it should present the rulings, charge, or decision complained of, the exceptions taken thereto, and so much of the evidence, or facts proved, as may be requisite to show the nature of the error complained of, and its effect or bearing on the finding, decision and judgment based upon it.

When an issue of fact is tried before a jury, the case prepared to review the proceedings can generally conform to the customary forms employed in such cases, of which samples are given in the standard books of forms.

Where it is tried before a Court, or Referees, the form is usually modified to represent the course of procedure, but substantially is unchanged.

While the tendency arising from the practice of a learned profession has always been towards the use of fixed forms, where that is practicable, and while the Courts have always encouraged that tendency, still it has been found impracticable to hold practitioners to artificial accuracy in this respect. If a case is a clear and intelligible history of all proceedings important to a review of a cause, it is all that can be insisted upon.

The record before us presents the bill and answers, the testimony taken before a Referee, and the decision of the Circuit Judge and his final judgment thereon. The order of reference does not appear, but, as no objection is made affecting its propriety, its absence is unimportant. It is not alleged that the proceedings in the case are not fully brought before us.

The propositions advanced by the respondent, to show that the appellant has not brought a proper case before this Court, are based upon the erroneous supposition that this Court cannot, in a case like

the present, do more than to correct errors of law committed by the Circuit Court. The whole case turns upon the decision of questions of fact. It is alleged by the plaintiff that the evidence adduced does not support the judgment. This Court is perfectly competent to examine the judgment of the Circuit Court, and to say whether that judgment is supported by the pleadings and evidence, inasmuch as it is a case within the constitutional description "cases of Chancery."

The cases cited by the respondent from the New York Courts have generally no bearing on the present question, as they relate to the method of preparing a case when matters of law alone are to be taken to the appellate Court.

It is argued that what is brought into this Court as a case has not been duly settled and filed in the Court below. If there were any irregularity in the preparation, service or settlement of the case, the place to take advantage of that was in the Circuit Court, as it is a record of that Court, and, therefore, should be subject to its control until removed into this Court.

As to its being filed below, it is only necessary to say that the Clerk of the Circuit Court has returned it into this Court as filed in his office, and there is nothing to the contrary laid before us. If irregularities in the appeal papers are complained of, that ought to be done before the Court proceeds to hear argument on the merits.

The respondent's next objection is, that there is no judgment filed. He contends that what is presented to us as a judgment is not, in fact nor law, a final judgment in the case. It must be conceded that the judgment brought before us is not complete according to the meaning of the Code. The Circuit Judge follows the practice which has heretofore prevailed in equity in this State. He files an opinion on the questions passed upon by him, embodying with it a judgment. After stating his conclusions in the matters of fact passed on by him, his opinion concludes as follows: "It is therefore adjudged," &c. The judgment that follows these words is not complete, for it does not set forth the amount due on the bond; but to make certain its purport, in that respect, it is necessary to refer back to that portion of the opinion that ascertains the amount due on the bond. Thus the judgment is not complete without being accompanied by the opinion. Again, the judgment directs that J. R. Tolbert "pay the remaining costs in this case," but does not fix the amount of those costs. As it regards the failure to enter into the judgment the amount of costs to be paid, it must be regarded as a

want of compliance with Section 337 of the Code, that provides that the amount of the costs, allowances and disbursements, when ascertained, shall be inserted in the entry of the judgment, but as this is to be done on the motion of the prevailing party, he cannot complain of the incompleteness of the judgment, in this respect, as he had it in his power to make it complete.

The practice of combining the conclusions of the Circuit Judge with the reasons assigned for arriving at such conclusions, and with the judgment in a single paper, so that that portion intended to operate as a judgment, cannot be fully understood without being accompanied by the opinion at length, does not comport with the requirements of the Code. A judgment is the action of a Court, ascertaining some act to be done, or forborne by a party. The grounds and reasons upon which the Court proceeded are no part of its judgment, using that term in its technical sense. Under the Code (Sec. 304,) the judgment is to be entered in a judgment book. It was not intended that this judgment book should contain the grounds and reasonings upon which the judgment was based. When a case is tried by the Court, as this was, although heard upon evidence taken before a Referee, the conclusions of the Court upon the questions of law and fact are to be made up by the Court and filed. The reasons for arriving at such conclusions may accompany the conclusions themselves, but they should not destroy their categorical character. The statement of the conclusions of law and fact is not, in technical form, a judgment, but is presumed to afford data sufficient to prepare a judgment in form. Section 291 of the Code distinguishes the separate character of the decision and the judgment. It says: "Judgment upon the decision shall be entered accordingly." Sometimes, as when there are complicated relations among the parties, or collateral interests to be adjusted to the disposition made of the main controversy, it is important that counsel should be heard after all matters disputable under the pleadings are finally disposed of, and before judgment final is entered.

It is highly inconsistent in practice to embody the conclusions of law and fact in the judgment. The record is unnecessarily encumbered, the labor of examining it and the cost of transcribing it increased, without any accompanying advantage.

It is evident that the paper produced was intended as a final judgment. If it is not such a judgment in form as the party was entitled to, that is no ground for preventing the opposite party from setting it aside. It is true, that if the judgment was not intended

as final, it would be premature to appeal before such final judgment was entered.

The present judgment disposes finally of all questions made by the pleadings, and must be regarded as final, in the sense of the Code.

The evidence adduced gives rise to certain conclusions that will be next stated. Certain facts are undisputed, and will be first stated.

The bond was taken by the defendant, Thomas, solely in his official character as Commissioner in Equity. While holding the bond in suit, in such official character, he paid to J. M. Sullivan, on account of the claims of the complainants, and to the defendants, Collins and wife, and Hickson and wife, as distributees, a large sum of Confederate money, which was received by them as so much money on account of their respective distributive shares of the fund secured by such bond, the receipts taken upon such payments all bearing date February 6, 1863.

These payments were not endorsed upon the bond as so much money paid for the benefit of the obligors of the bond, but were entered in the official cash book of the Commissioner as payments made by him in that character.

These payments did not extinguish the interest of Sullivan, Hickson or Collins, but left still unsatisfied a portion of their demands against the amount secured by the bond.

These payments were not made or intended by defendant, Thomas, as an advance on account of the bond, or as satisfying the bond to any extent, as between Thomas and the obligors, but was intended by Thomas as a purchase of the bond either for the use of his father or himself.

That subsequent to such payment being made, Thomas assigned the bond in form to S. Thomas, his father, who subsequently reassigned it to the defendant, W. M. Thomas.

That at the determination of defendant, Thomas' official term as Commissioner in Equity, he did not turn over the bond to his successor in office, but retained it, claiming to hold it as his private property.

That on the 31st of October, 1865, a settlement was made between the Tolberts and Stokes' wife, by which the interest of the latter was extinguished by the payment to Stokes and wife, by the Tolberts, of a sum fixed upon by way of compromise.

That on the last mentioned day a settlement was made between the defendant, Thomas, with the Tolberts, under which the Tolberts

paid to defendant, Thomas, $2,600 in gold, the receipt given therefor by defendant, Thomas, containing the following language: " In full payment of my interest in the matter of the shares of Hickson and wife, Collins and wife, and James M. Sullivan."

That upon such payments being made, the defendant, Thomas, delivered the bond, with the receipts of Stokes and himself endorsed thereon, to his successor in office as Commissioner in Equity.

The clear weight of evidence establishes the following facts, which will be separately stated with a reference to the evidence on which the proof of such facts respectively rests:

1. The Confederate money paid by the defendant, Thomas, to Sullivan, Hickson and Collins, as set forth in the receipts, dated February 6th, 1863, was the money of the defendant, Thomas, and was so paid for his own account and benefit.

The answer of Thomas takes the position that the money advanced was his own. His testimony taken upon interrogatories leads conclusively to the same inference.

A return made by defendant, Thomas, as Commissioner in Equity, on the 8th of July, 1863, was relied on as evidence. By this return defendant, Thomas, is debited as follows: " February 10th, 1863, received from S. Thomas, assignee of bond, $15,631.43."

Assuming the competency and truth of this entry, and it would appear that this bond in suit was sold at that date to S. Thomas, and the sum of $15,631.43 received in cash on such sale, although the date of the entry, February 10th, does not agree with the dates of the payments to the distributees, the latter appearing from the receipts to be February 6th, yet if that amount of cash was actually received from S. Thomas, it might be fair to infer either that the money received from S. Thomas was actually paid to the distributees, or that the money advanced by defendant, Thomas, was replaced by that derived from the sale of the bond to S. Thomas.

It was very properly contended that the statement made by the defendant, Thomas, could not be employed as evidence in his favor of the facts affirmed by himself; but there is a difficulty in accepting the statement that is substantial rather than technical. The entry in question is clearly contradicted by the answer and the testimony given by defendant, Thomas.

In his answer, after stating the fact of an advance to the distributees in terms that admit of no other conclusion than that the funds advanced are his own, he says, as to the property in the bond: "Regarding himself as the sole owner of the bond, he did not trans-

fer it to his successor in office, but retained it. Being in debt to his father, and desirous of adjusting his private affairs for the emergencies of the battle field, he assigned the bond, as stated in the bill, to his father, and upon settling with him, re-assigned it, as he thought he had a perfect right to do."

According to this statement of the answer of the defendant, Thomas, the consideration of the transfer of the bond was not an amount of money, representing the value of the bond, paid by S. Thomas on the purchase of the bond as so much money of the estate. On the contrary, the consideration of the transfer to S. Thomas, as here stated, is a personal indebtedness between father and son, in no way connected by any allegation or proof with the transactions the subject of the present question. The matter assigned by the answer as part of the ground of assigning the bond to S. Thomas, tends to show that the bond could not have been assigned at the date stated in the return of July, 1863, namely, February 10, 1863. It is stated by the answer that the assignment of the bond was in part induced by the fact that the defendant, Thomas, was preparing for the "emergencies of the battle field." As late as July, 1863, he was acting as Commissioner in Equity, and it is to be inferred from the testimony of J. P. Moore, his successor as Commissioner in Equity, that he continued so to act down to January, 1864. The improbability that defendant, Thomas, would be engaged nearly a year before the expiration of his term of office in making preparations for the "emergencies of the battle field," is converted into a clear inference to the contrary by the statements of the answer, and the silence of the evidence on the subject.

That portion of the answer above cited clearly indicates that the retention of the bond, on leaving the office of Commissioner, was an act precedent, in the order of time, to its assignment, to his father. Such a construction is essential to an understanding of the narration of events, evidently intended by the answer to be set forth in the order of their occurrence.

The answer of the defendant, Thomas, as to part of the amount of money in his hands for the purpose of paying the demands of the distributees, gives an account of the mode in which it was procured irreconcilable with the fact alleged by the return, that it came, in cash, in one sum, from S. Thomas, upon a sale and assignment of the bond.

The part of the money here alluded to is that alleged to have been raised for the purpose of paying the interest of Stokes and wife.

The answer states that this money was borrowed. Defendant, Thomas, in his testimony, says as follows : " I made the arrangement with Hamlin Beattie by which the draft would be honored in favor of the Stokes'."

The date of this borrowing is sufficiently fixed by the letter of defendant, Thomas, to T. Henry Stokes, as about April 13, 1863. There is no view that can be taken of the evidence last referred to, that can reconcile it with the statement in the return of July, 1863, that the defendant had in hand, as Commissioner, in February, 1863, an amount, in cash, sufficient to pay the distributees.

There is no proof that the money paid by defendant, Thomas, to the distributees, or any part of it, came from S. Thomas, his father. Both the statements of the defendant, Thomas, and of the Tolberts, agree that it was not advanced by the latter, nor by Thomas as the agent of the Tolberts. We have already seen that the answer of Thomas is inconsistent with such idea.

The answer of G. W. Tolbert admits, distinctly, that the arrangement made with Thomas to pay him the proceeds of cotton sold for the purpose of refunding the amount advanced by Thomas was not carried out. The settlement between the Tolberts and the defendant, Thomas, in October, 1865, shows two things : first, that no advance of money had theretofore been made by the Tolberts to Thomas on any such account; and, second, that the Tolberts regarded the defendant as holding the bond in his own right, as acquired with his own money, and not as standing to them in the relation of an agent who has advanced money for the account of his principal.

It will be necessary, in this connection, to refer to the letters or admissions of the Tolberts, for the purpose of establishing the proposition under consideration. This admission will be important, when considering how far the Tolberts are affected by the transactions of defendant, Thomas, in dealing with the bond as his private property.

2d. The amount advanced and paid to complainants and defendants, Hickson and wife, and Collins and wife, was accepted by the parties solely on the representations of the defendant, Thomas, that the money tendered to them had been paid into his hands by the Tolberts, in satisfaction of their bond, and such representations were false, and were made to induce the parties to accept the Confederate money for the benefit of the defendant, Thomas.

The defendant, Thomas, is entitled to the full benefit of the alle-

gations of his answers upon the issue of fact, such weight to be determined after examining them in their relation to the evidence adduced from other sources. The answer states that the transaction as there stated was explained to Collins, acting on his own account and in behalf of Hickson and wife. It also states that defendant explained the whole matter to J. M. Sullivan. The nature of these explanations is not directly stated, and can only be inferentially made out. The answer in this respct is too vague to be entitled to much weight, even standing by itself. It is, however, directly contradicted by the testimony of Sullivan, Hickson and Collins, and no satisfactory explanation of these discrepancies is given in the testimony of the defendant, Thomas, who had an opportunity upon his examination of giving the true version of the matter.

J. M. Sullivan testifies as follows : " Thomas wrote to me that the money was paid, and that he would make Stokes take his share; that Tolbert had sold his cotton, and had paid in the money. I then took it, as he said that all had taken it except Stokes and his wife. I would not have taken the money if I had known that Tolbert had not paid the money. Thomas led me to believe that Tolbert had paid the money."

G. W. Collins testified as follows: " Thomas told me that the Tolberts had paid for the place at ·Ninety-Six, and that the money was in the office, and to call and get it. I received Confederate money from Thomas. I would not have taken the money had I known that the money had not been paid by the Tolberts. He told me that the Tolberts had sold their cotton for Confederate money. I told him that I would not take it at all, except for the fact that the young men were in the army. He told me that he had notified all the parties that the money was in the office. I did not receive the whole amount; there was about $150 behind." Collins, on being recalled, repeated this testimony in a more circumstantial and stronger form.

W. Hickson, in his testimony, says: " That defendant, Thomas, stated to me that the Tolberts had paid the money on their bond for the Shaw land, and wanted me to receive it, as he desired to get it out of his hands. I told him I did not want it, and preferred they had waited till the war was over, as I did not care to take that debt in Confederate money ; but he thought as it had been paid by the Tolberts, that I ought to receive it as a citizen desirous of maintaining the Confederacy. In consideration of these facts I yielded, and received it."

The defendant, Thomas, had an opportunity to contradict this testimony of Collins, for it appears, by his own statement, that he had seen that testimony before giving his own. Upon his examination he testified as follows: " Until I saw Collins' testimony the other day, I always believed that he knew all about the transaction that I advanced money for Tolbert; I believe he did know it." This is all that is said in reply to testimony involving a charge of fraudulent misrepresentation. The testimony of defendant, Thomas, involves no legal responsibility for its truthfulness, as it is the mere statement of his belief on unimportant and irrelevant matter.

It will be observed that in the testimony just recited, it is said that the money was advanced for Tolbert. This statement is contradicted by the answer of defendant, Thomas, and the well established fact that on the final settlement between Thomas and the Tolberts, Thomas was treated as the owner of some portion of the interests of Sullivan, Hickson and Collins in the bond ; and according to the face of the receipts, the object of the settlement was to extinguish these interests in the hands of Thomas to such extent, and not to refund to Thomas money advanced by him as the agent of the Tolberts.

The foregoing evidence is all that has any important bearing on the second conclusion of fact above stated, and it leads to such conclusion, not upon doubtful proofs, but by a clear and overwhelming mass of testimony, met by no contradiction such as the nature of the testimony demanded.

Even if, at the time that Thomas made the representation that the parties to the bond had paid the same, he had good ground to expect that they would do so within a reasonable period, the representation that they had done so must still be regarded as false. On the disappointment of such an expectation, had Thomas laid the facts before the parties in interest and allowed them an opportunity of rescinding or adhering to the arrangement, such action might have ignored a fraudulent motive in Thomas. On the other hand, having left the parties under the influence of the original misrepresentation, a fraudulent intent must be presumed, from the fact that the advantage to be derived from their receiving Confederate money could enure only to the benefit of Thomas.

3d. The defendant, Thomas, from the time of such payment, held the bond in suit, claiming the same as his individual property, until it was returned to his successor in office in October, 1865, notwithstanding his office as Commissioner in Equity, in the meantime, had

ceased, and his successor in office had qualified and was in the discharge of his duty. The ground of this conclusion has already been stated in what was said relative to the first conclusion of fact.

4th. The settlement of the defendant, Thomas, and the Tolberts, in October, 1865, was, as between themselves, a voluntary settlement by way of compromise, intended to extinguish so much of the interest of Sullivan, Hickson and Collins, as had vested in the defendant, Thomas, in his individual right, and was not intended as a settlement between the defendant, Thomas, as obligee, and the Tolberts as obligors of the bond.

Neither the defendant, Thomas, nor the survivor and representative of the Tolberts, seek to disturb the settlement of October, 1865. On the contrary, they rest upon it as a finality.

The defendant, Thomas, in his answer, insists that in this settlement he "receipted the Tolberts for his interest only in the bond, and received therefor, in gold, about what the money he advanced to Tolbert was worth." The answer of George W. Tolbert says that " he then entered upon negotiations with the said Thomas for settlement of his interest, and agreed upon the terms; and a receipt in conformity with the agreement was entered upon the bond and signed by the said W. M. Thomas, in which he acknowledges the receipt of the sum of twenty-six hundred dollars in gold, in full of his interest in the bond, as above set forth." He further says: " The receipts were entered upon the bond with the knowledge of the said James P. Moore, the Commissioner, and as defendant believes, with his approval. The bond was then left with the said Moore to be filed with the record. The defendant then regarded the bond paid. He is now surprised at the allegation of the bill of unfairness, collusion and fraud." Both parties to the settlement thus rely upon it as final, but differ as to the effect of the settlement—the one holding that only this interest of Thomas was extinguished, and the other that the bond was, in effect, paid.

Tolbert, in that portion of his answer just referred to, makes no other statement, as to the terms and intention of the parties, than that afforded by the receipt, and sets forth, substantially, such receipt, stating that it was in conformity to the agreement with Thomas on the subject. It has already been observed that, in speaking of the negotiation that led to this agreement, he refers to it as a negotiation in regard to Thomas' interest in the bond.

The receipts themselves sustain the conclusion that the subject-matter of the settlement was Thomas' interest in the bond, be that

what it might; that there was no expressed nor implied understanding that Thomas' interest extended beyond the amount of money advanced by him, and that if Tolbert arrived at a different conclusion as to the effect of the settlement, it arose from his own understanding of the matter.

That, in making these settlements, Tolbert did not regard Thomas as acting in any official character, is evidenced by the fact that, at the time he settled with Stokes, he requested Moore, the Commissioner in Equity, to be present at the signing of the receipt, evidently relying on the presence of Moore as essential to the validity of the transaction, so far as it had any official significance, and the settlement with Thomas was subsequent to that with Stokes.

5th. At the time of this settlement, the right of the defendant, Thomas, to the possession of the bond, as regarded the Commissioner in Equity, was in contest under a rule to show cause, at July Term, 1864, why that bond should not be returned to the Commissioner's office, and that such rule was obtained by Mr. Moore, upon the representations of R. R. Tolbert of misconduct on the part of the defendant, Thomas.

These facts are testified to by Mr. Moore, who states that, after the issuing of this rule, he heard nothing more about the Tolberts' bond until October 31st, 1865. That the Tolberts had · distinct notice of the pending of this rule, is not shown directly by the evidence; but it appears by the letter of R. R. Tolbert, dated February 19th, 1864, that the writer was aware that Moore was making efforts to get possession of the bond, or intended to make such effort, for he says : "As soon as you can get the notes let me know, and I will come to your office and settle." The notes, here spoken of, evidently means the bond in suit, for that is the only subject to which the letter relates.

As it regards the rights of the complainants as against the Tolberts, there are certain other conclusions of fact arising from the pleadings and proofs that will next be stated.

6th. It is not established, either by direct proof nor by any necessary inference from the matters proved, that either of the Tolberts had notice until after the payments made to Sullivan, Hickson and Collins, of the use of improper means to induce the acceptance of such payments.

7th. The defendants, the Tolberts, are chargeable with notice, at the time of the settlement, of the transactions that had previously occurred between the defendant, Thomas, and Sullivan, Hick-

son and Collins, and which are the grounds of the present claim for relief.

Moore testifies that previous to February 19th, 1864, R. R. Tolbert applied to him for a statement of the amount due on the bond, as he wanted to pay it. That not being able to find the bond, he so informed him by letter, in reply to which he received from R. R. Tolbert, the letter dated February 19th, 1864. This letter recognizes the fact that the defendant, Thomas, in making these payments, was acting in his own interest, as it denies any agency or authority in Thomas, derived from the Tolberts, to make such payments. Moore states that on the 3d of March, 1864, R. R. Tolbert tendered to him $17,900, in Confederate currency, in payment of the bond, which he refused to receive. Moore says he "showed Mr. Thomas' account book and explained to him the entry made by Thomas, that it purported to have been done at the instance and request of G. W. Tolbert. Mr. Tolbert replied that George had not requested Thomas to do so, as he was George's agent, and he had been trying to get Thomas to take Confederate money and Thomas had refused, alleging as his reason for refusing that the parties to whom the money was going had refused to receive Confederate money from him. Mr. Tolbert was very indignant towards Thomas, and said that Thomas had no authority from George, nor from himself, to have made the arrangements he had made about the bond."

G. W. Collins says: "In March, 1865, on my way to Florida, I stopped at the house of Tolbert. He asked me if Thomas had paid off the parties for the Cambridge lands? I told him I had received $4,500, and I presumed the others had received theirs, as Thomas had told me he had notified them that the money had been paid in and was ready. He replied that Thomas had no authority for paying off the bond; that he was the agent for his sons. This was R. R. Tolbert, who is now dead."

The foregoing testimony stands uncontradicted, and shows that all the important facts upon which the complainants base their claims to relief, were brought to the notice of the Tolberts before the settlement with Thomas.

In addition to the foregoing, it is evident that the Tolberts knew, at the time of the settlement with Thomas, that the latter had no lawful right to the custody of the bond, or to represent any other interest in the transaction than his individual interests. This is evidenced by the letter of R. R. Tolbert to Moore; also by the fact that the Tolberts did regard the settlement with Stokes

complete without the presence of Moore, the legal custodian of the bond.

8th. The settlement with Thomas was without the concurrence or consent of Moore, and with full knowledge of his rights in regard to the same.

Although Moore was present at the settlement of the Tolberts with Stokes, yet it must be concluded that he was not concluded, and did not authorize or consent to the settlement with Thomas, for the reasons: 1st, That fact is material to the case of the Tolberts as a means of showing payment on the bond, but is neither alleged or proven. 2d. Moore's testimony excludes such fact. He states that Tolbert stated to him that he had settled with Thomas at the time he demanded the bond, on the ground of its being paid. Moore's position is disclosed in the reply he made to Tolbert's question as to what he thought about the matter. He says: "I replied I did not know what course Hickson, Collins and Dr. Sullivan would pursue in the matter. If they did nothing, it would be an end of the case."

The foregoing conclusions have been stated with more than ordinary particularity and care, for the reasons that they differ materially from those of the learned and experienced Judge who tried the cause, and for the further reason that the transactions involve the conduct of an officer holding a high position of trust connected with the administration of justice, and it is due to the Court, whose authority he has misused, that the closest scrutiny should be made with the transaction.

The conclusions of law, based upon the foregoing facts, will next be stated.

The Confederate notes tendered by Thomas to Sullivan, Hickson and Collins, were not a legal tender, and laid them under no obligation to accept them in lieu of good money. The duty imposed on Thomas was to enforce the bond, by converting its obligation into good money, and paying it to the distributees according to their respective demands. This duty was not wholly performed. In lieu of strict performance, Thomas offered them a commodity regarded by the community as money, but not possessing the character of a legal representative of money value. This Confederate currency had some commercial value, because it could readily be converted into that which had intrinsic value.

If Sullivan, Hickson and Collins are to be regarded as having voluntarily accepted the Confederate currency, then their accep-

35

tance stands on the footing of a contract, based on the value tendered as its consideration. The terms of the acceptance did not, on that assumption, extinguish the whole demand under the bond, but only to the extent of the nominal value of the Confederate currency received, leaving in them a right to have the bond enforced for the satisfaction of the residue of their demand. Acceptance being in the nature of a contract, is avoided by any misrepresentations made, that induced the opposite party to accede to its terms.

The representations made by Thomas were false, and induced the parties, acting on the belief that they were true, to accept the Confederate money as *pro tanto* performance.

The parties misled had a right to rescind, and on tendering a return of the amount received by them, to be re-instated in their original right. Not having done so, they are to be charged with the value of the Confederate money at the time of its receipt, but are to be regarded as re-instated as to the residue of their claim as it stands at the time of their acceptance.

As affected by the settlement between Thomas, Sullivan, Hickson and Collins, the right of the respective parties stood as follows: the obligors, or their representatives, were liable to pay the full amount due on their bond, over and above the payments previously credited upon it.

The complainants, and the defendants, Hickson and wife, and Collins and wife, had the right to demand the enforcement of the bond, and to receive the balance that would be found due after deducting the actual value of the Confederate currency received by them. Stokes and wife had a like right to have the bond enforced for their benefit. Thomas had a right, as equitable assignee of Sullivan, Hickson, and Collins, to demand out of the proceeds of the bond, an amount equal to the actual value of the Confederate money paid to Sullivan, Hickson and Collins. Thomas had also, as Commissioner in Equity, authority to hold the bond, and to take measures to secure its enforcement. The right to hold the bond and enforce it did not reside personally in Thomas, but in the office held by him, and at the termination of his official term that right passed to his successor in office.

The retention of the bond by Thomas was a trespass that conferred no rights upon him, and could afford no security to those dealing with him, for the bond disclosed the true claims to its pos-

session, and the law charged all parties with a knowledge of the legal consequences resulting from its legal character.

The Tolberts cannot be regarded in law as having dealt with, nor did they in fact deal with Thomas in any other than a personal character, and in regard, alone, to such personal rights as he might have acquired through the transaction with Sullivan, Hickson and Collins. We have seen that all that Thomas thus acquired was a claim as equitable assignee of Sullivan, Hickson and Collins, of so much of their original demand as equalled the value of the Confederate currency paid to them. The Tolberts acquired just this, and no more, in their treaty with Thomas; nor have they any equity broader or more comprehensive than this; for they are chargeable with notice of the misconduct of Thomas in his dealings with Sullivan, Hickson and Collins.

The settlement with Stokes was final unless impeached on sufficient grounds, and no such grounds are presented in the present case.

The amount due upon the bond should be computed, with interest, including the demands of the complainants and of the defendants, Hickson and Collins, and including the claim of Stokes and wife, as originally established, and also including the payments endorsed on the bond prior to the payment made by Thomas to Sullivan, Hickson and Collins. From the amount thus computed must be deducted the value of the Confederate currency paid to and received by the complainants, and the defendants, Hickson and Collins, with interest to the date of judgment. Judgment must be given for the amount thus ascertained according to the respective rights of the complainants and the defendants whose claims are in whole or in part unsatisfied according to the principles of this decision.

The decree of the Circuit Court must be modified accordingly, and the cause remanded to the Circuit Court for further proceedings.

*Wright*, A. J., concurred.

*Moses*, C. J., absent at hearing.