# United States Court of Appeals
## For the First Circuit

_____

No. 99-1747

JOHN WALSH,

Petitioner, Appellee,

v.

JACQUELINE WALSH,

Respondent, Appellant,

and

MARTHA MILLER,

Intervenor, Appellant.

_____

No. 99-1878

JOHN WALSH,

Petitioner, Appellant,

v.

JACQUELINE WALSH,

Respondent, Appellee,

and

MARTHA MILLER,

Intervenor, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

_____

Before

Selya, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

_____

Barry S. Pollack, with whom Bernard J. Bonn III and Dechert Price & Rhoads were on brief, for appellant Martha Miller.
Robert Najarian for appellant Jacqueline Walsh.
E. Chouteau Merrill, with whom Amanda Buck Varella and Brown Rudnick Freed & Gesmer were on brief, for appellee.
Susan M. Basham, Colleen Brunnick McElhinney, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. for amici curiae National Network to End Domestic Violence, National Network to End Domestic Violence Fund, Massachusetts Citizens for Children, Massachusetts Society for the Prevention of Cruelty to Children, and Women Against Abuse, Inc.

_____

July 25, 2000
_____

**LYNCH, Circuit Judge**. From Ireland, John Walsh petitions for the return of his two children, "M.W." and "E.W.,"[1] to that country, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. See Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (1980) (Hague Convention). His estranged wife, Jacqueline Walsh, now living with the children in Massachusetts, says that John's petition should be denied and the children should not be sent back to Ireland because: 1) John is precluded from petitioning the district court under the fugitive disentitlement doctrine; and 2) the Hague Convention does not require children to be returned to their country of habitual residence when there is a "grave risk" that they will be exposed to "physical or psychological harm" or an "intolerable situation." Hague Convention, art. 13(b).

The district court rejected both of Jacqueline's contentions and granted John's petition, provided he agreed to certain important undertakings pertaining to the safe return of the children. See In re Walsh, 53 F. Supp. 2d 91 (D. Mass. 1999) (Walsh II); In re Walsh, 31 F. Supp. 2d 200 (D. Mass. 1998) (Walsh I). Jacqueline and Martha Miller, Jacqueline's sister and a belated intervenor on behalf of the children, appeal.[2] We affirm in part and reverse in part, and we remand with

---

[1]    We use initials in place of the children's full names. For the adult participants, we use first names after the initial reference.

[2]    Jacqueline and Martha also appeal the district court's refusal to adjudicate all the claims presented in Martha's Declaration by Intervenor of Claims and Defenses. John appeals the district court's decisions to allow Martha to intervene and to enter a stay of

-4-

instructions to dismiss the petition.

## I.

John, an Irish national, and Jacqueline, a U.S. national, met at an Irish pub in Malden, Massachusetts, in June 1988. On August 24, 1989, a daughter, M.W., was born to them in Massachusetts. On May 3, 1992, John and Jacqueline were married in New York State. They lived in Malden during these years, though John spent a good part of his time in Ireland until M.W. was about two years old in 1991.

The events of the following five years evidence John's violent behavior toward his wife and others. In August 1992, John beat Jacqueline after he became enraged that he was not asked to be a pallbearer at Jacqueline's aunt's funeral. On December 31, 1992, after a New Year's Eve party, John abused Jacqueline again.

On October 31, 1993, a wake was held for a neighborhood child in Malden who had apparently died of a drug overdose. John took the death badly and drank heavily at a pub following the wake. Upon returning home, he became enraged at a young man, who lived in the house next door, because John thought that the man had provided the dead child with drugs. John ran next door, banged on the door, breaking the door's glass, and yelled that he was going to kill the man. He did this repeatedly until the police arrived, at which point he was handcuffed and arrested. On November 1, 1993, a two-count

execution of its order pending appeal.

criminal complaint was filed against John in the Malden District Court, which charged him with: 1) attempting to break and enter, in violation of Mass. Gen. Laws ch. 274, § 6; and 2) threatening to kill another person, in violation of Mass. Gen. Laws ch. 275, § 2.

John was arraigned, but not tried, as he absconded to Ireland on January 11, 1994. See Walsh II, 53 F. Supp. 2d at 92. A default warrant exists for his arrest.[3] Michael Walsh, his twenty-year-old son from a previous relationship who had been living with John and Jacqueline in Malden since they were married, returned to Ireland with him.

On March 31, 1994, Jacqueline and M.W. followed John to Ireland. Jacqueline was pregnant at the time. The family first lived in Waterford City and later moved to the nearby town of Tramore. As the district court found, Jacqueline was the "victim of random beatings." Walsh I, 31 F. Supp. 2d at 202.

On June 23, 1994, Jacqueline went to see Dr. Anne Marie Burke, her Irish physician, for her pregnancy. She was seven months pregnant at the time. Dr. Burke noticed that Jacqueline was losing weight and was concerned about bruises she noticed on Jacqueline's body. The day before John had beaten Jacqueline and had only stopped

---

[3] On March 10, 1999, a second criminal complaint was issued against John, this time in the U.S. District Court for the District of Massachusetts, for unlawful flight to avoid prosecution, in violation of 18 U.S.C. § 1073.

when Andrea Walsh, John's fourteen-year-old daughter from a previous marriage, intervened. A son, E.W., was born soon thereafter, on August 25, 1994.

On October 11, 1996, Jacqueline saw Dr. Burke again. Jacqueline said she had been assaulted by John the previous day. Her face, chest, and knees all were swollen and bruised, her arms were marked by hard gripping, and she had suffered a broken tooth. Dr. Burke advised her to seek protection and to get a barring order from a court, which would "establish and govern the rights of each spouse to be in the presence of the other and to have access to their children." Id. at 203. She also advised Jacqueline to get photographs taken of herself at Phelan's Pharmacy, which Jacqueline did that same day. The photographs show bad cuts and bruises on her face.

In December of 1996, John pushed Jacqueline down so that she hurt her coccyx bone in her lower spine. Soon thereafter, Paul Walsh, another of John's sons from a previous relationship, invited Jacqueline over to his house, which was across the street, for coffee. He asked Jacqueline about her bruises. She told him that John had beaten her. Angry with his father, Paul called the police. The police arrived and John denied beating Jacqueline. Jacqueline was frightened and declined to press charges. She decided to stay in the house because Michael Walsh (who had been thrown out of the house by his father) said he would stay there and protect her.

On May 24, 1997, the night before M.W.'s communion, John, Michael, and Jacqueline's sister Martha, who had come to Ireland for the event, went out to a number of local pubs. On the way home, where Jacqueline and the children were asleep, John attacked Michael, fists flying, simply because Michael had broken a beer bottle. This was not their first fight, or their last. Indeed, they immediately fought again when they arrived back at the house. When all was over, both John and Michael were bleeding and the room was splattered with blood. John hauled his daughter M.W. down to the bloodied room where her half-brother was and told her to look at her bloodied half-brother and to tell him to leave. M.W. was very frightened -- she was about eight years old at the time. Jacqueline intervened and took M.W. back to her room and then Jacqueline went to her own bedroom. John followed Jacqueline in and hit her with an open hand about the head, causing a swollen and bloodied ear. The next day, John refused to go to the communion because it was obvious he had been in a fight.

The day after the communion, May 26, 1997, John again assaulted Jacqueline and she fled the house, without the children. He had repeatedly punched her in the head and kicked her. Fearing for her life, Jacqueline went to her friend Anne Phelan's pharmacy. Phelan's daughter took Jacqueline to the police station, where the police told her that domestic abuse was not uncommon in Tramore, and that she should seek help at the legal aid office in Waterford City, the county

-8-

seat. Jacqueline filed a report and, accompanied by the police, she returned to the house for her things, only to find John throwing her bags into the street.

The next day, May 27, 1997, Jacqueline saw Dr. Burke. The doctor noted extensive bruises and scratch marks and concluded that Jacqueline's life and health were at risk. A few days later, on May 30, 1997, Jacqueline sought a "protection order," similar to an American temporary restraining order. One was issued that same day by the Waterford District Court. The order required that John "not use or threaten to use violence against, molest or put in fear" Jacqueline and that he "not watch or beset the place where [she] . . . resides." By the same order, a July 25th date was set for a hearing on the issuance of a "barring order."

For the first few weeks after she had fled her home, Jacqueline stayed at Paul's house. It was during this period that Jacqueline began a relationship with another man, Michael Murphy.

On July 15, 1997, John assaulted Jacqueline despite the clear terms of the protective order. On July 25th, at the first court date on the barring order, John agreed that he would vacate their house and let Jacqueline and the children stay there.

The application for a barring order was adjourned several times to November 28, 1997, "on the undertaking of Mrs. Walsh not to take the children out of the jurisdiction and on Mr. Walsh's

undertaking to stay away from the family home." On September 26, 1997, and again a few weeks later in October, the house in which Jacqueline and the children lived was broken into and ransacked. Jacqueline believed that John was responsible and so told the police. Though the case against John was never pursued in Ireland, the district court concluded the same. See Walsh I, 31 F. Supp. 2d at 204 n.3. On October 3, 1997, John came to the house and threatened harm toward Jacqueline, despite the protective order, which forbade him to do so.

It is about this time, apparently, that Jacqueline began preparations to return to the United States. She contacted Harry Murphy, a licensed social worker and the director of the Arbour Mental Health Clinic in Malden, and applied to the U.S. State Department for American passports for the children. On November 15, 1997, the house was broken into and ransacked once more, again apparently by John. He smashed everything breakable and threw turf around the house. Afraid for the safety of the children and herself, Jacqueline called her father. He told her to go to Dublin and fly home to the United States and he would pay for it. On November 17, 1997, she did so, taking the children, her father having forwarded her the money to pay for the tickets. Several weeks later, Michael Murphy joined them in the United States. Jacqueline thus violated her undertaking to the Irish court that she would not remove the children from Ireland.

Jacqueline and her children began counseling in January

-10-

1998.[4] On January 19th, M.W. told Murphy, the social worker, that she had nightmares about being kidnaped, that she had flashbacks of her father's violent acts, that she had a feeling of isolation, that she was terrified of returning to Ireland, and that she had trouble eating. In particular, Murphy reported that M.W. had memories about her mother being abused and one episode specifically involving herself. She said that her mother was hit and hurt by her father, and that her father pushed her mother down stairs. She also said that her father once became enraged at her -- M.W. herself -- over dirty shoes, spitting in her face and calling her stupid, and that he spanked her brother, E.W., very hard for getting into a cookie jar. She said, as well, that when John had severe headaches he would become angry, scream, and lock the children in their rooms. She said she was terrified of phone calls from her father.

Murphy suggested, as a form of therapy, that M.W. write letters to her father. In her letters she wrote that she would like her father to stop calling because it frightened her, that she did not want to see him, and that she did not want him to hurt her mother, E.W., or herself. M.W. drew pictures of a hiding place where she felt safe at her grandfather's house here in the United States.

Murphy diagnosed M.W. as having post-traumatic stress

_____

[4] Also in January 1998, Jacqueline filed a complaint for separate support and child custody in Middlesex Probate Court in Massachusetts.

disorder (PTSD). <u>See</u> <u>Diagnostic and Statistical Manual of Mental</u>
<u>Disorders</u> 424-25 (4th ed. 1994) (DSM-IV). In his opinion, M.W. had
begun remission since being brought to the United States, but, if she
were to be returned to Ireland, she would suffer a relapse. Murphy
recommended that M.W. see Dr. Martin Hart, a psychiatrist who works at
the clinic, to determine if medication was in order. On January 22nd,
she saw Dr. Hart.[5] Dr. Hart concluded that M.W. had adjustment reaction
with features of anxiety.[6] <u>See</u> DSM-IV at 623-24. M.W.'s physician at
the Malden Hospital Family Health Center, Dr. Jill M. Schmidtlein,
reported later in 1998 that M.W. said that "I don't want to go with my
father because he'll hit me again." The district court concluded that
M.W. "does not wish to return to Ireland or to have anything further to
do with her father." <u>Walsh I</u>, 31 F. Supp. 2d at 204.

On August 5, 1998, John filed a petition in the United States
District Court for the District of Massachusetts for the return of M.W.
and E.W. to Ireland, pursuant to the Hague Convention. He remained in
Ireland. Acting expeditiously, as is proper in Convention cases, the

---

[5]     Dr. Hart also expressed concern that the mother had come to
him only to obtain reports that would assist her in her legal battles.
Despite his wariness over being used, he still made the diagnosis
described.

[6]     These diagnoses are not incompatible. <u>See</u> DSM-IV at 427
(noting that the "diagnosis of Adjustment Disorder is appropriate both
for situations in which the response to an extreme stressor does not
meet the criteria for Posttraumatic Stress Disorder . . . and for
situations in which the symptom pattern of Posttraumatic Stress
Disorder occurs in response to a stressor that is not extreme").

district court conducted a three-day bench trial, on September 29th and 30th and October 2nd, to resolve the only contested legal issue: whether returning the children to Ireland would pose a grave risk of physical or psychological harm. See Hague Convention, art. 13(b). Jacqueline presented three witnesses: herself, Martha, and Harry Murphy. John presented no witnesses, though his lawyers introduced some documents during cross-examination. In addition to testimony describing the events related above, Jacqueline testified that John slapped, hit, berated, and spit at M.W. She also said that he would lock the children in their rooms, and that M.W. was often present when he abused her. In papers filed with the district court, John has denied that he was abusive and says that Jacqueline's injuries were caused as a result of her drinking or in other ways. On October 2nd, the district court entered an order in John's favor, with an opinion to follow, ordering the children to be returned to Ireland. On December 18, 1998, the district court formally entered judgment for John and granted his petition, subject to a number of undertakings. See Walsh I, 31 F. Supp. 2d at 208.

On January 12, 1999, while preparations were being made for the return of the children to Ireland pursuant to the court order, Martha filed a motion to intervene on behalf of the children, and both Jacqueline and Martha filed motions to dismiss or vacate the district court's December 18, 1998, Judgment and Findings of Fact and

-13-

Conclusions of Law. Martha contended that the fugitive disentitlement doctrine barred John, a fugitive from justice in Massachusetts, from petitioning the federal courts. She also claimed that the United States -- and not Ireland -- was the children's place of habitual residence, and, consequently, their return to the United States was not wrongful under the Convention. Martha, finally, renewed the claim that the children would face a grave risk of physical or psychological harm if they were returned to Ireland and submitted additional affidavits to support this contention.

At a hearing that same day, the district court allowed Martha to intervene, but limited her intervention to the issue of whether the fugitive disentitlement doctrine barred John's petition. The court held argument on this issue on January 20, 1999, and on June 11, 1999, the district court denied Jacqueline and Martha's motion. See Walsh II, 53 F. Supp. 2d at 95. In light of the many issues of first impression posed by this case, the district court stayed execution of its order pending appeal. See id.

Jacqueline and Martha appeal the grant of John's petition. They also appeal the district court's decision to limit Martha's intervention. John appeals the court's decision to allow intervention. He also appeals the court's issuance of a stay pending appeal.

## II.

We deal first with the procedural appeals. Martha and

-14-

Jacqueline say that the district court erred when it refused to hear all of Martha's arguments in her Declaration by Intervenor of Claims and Defenses. John says that the district court erred when it allowed Martha to intervene because Martha did not satisfy Fed. R. Civ. P. 24, as the children's interests were adequately represented by their mother and the intervention was untimely, and because the Convention does not provide for intervention on behalf of children. John also says that the district court erred when it stayed the execution of its order because a stay is contrary to the language and purpose of the Convention and because Fed. R. Civ. P. 62(d) "does not address the situation of the parties to this case."

Though "it is commonly said that review of the district court decision is for 'abuse of discretion,' . . . this may be a misleading phrase. Decisions on abstract issues of law are always reviewed de novo; and the extent of deference on 'law application' issues tends to vary with the circumstances." Cotter v. Massachusetts Ass'n of Minority Law Enforcement Officers, No. 00-1056, 2000 WL 964656, at *2 (1st Cir. July 17, 2000). We review the district court's issuance of a stay order also for abuse of discretion. See Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 109 F.3d 850, 856 (2d Cir. 1997). Intervention is governed by Fed. R. Civ. P. 24.[7]

_____

[7] The rule provides, in pertinent part:

(a) Intervention of Right. Upon timely application anyone shall

It was well within the district court's discretion to limit Martha's intervention, which took place long after trial and judgment, to a distinct legal issue that required no additional factfinding. In this way, the court balanced the interests of the intervenor with the interests of the petitioner, particularly taking into consideration the timing of the intervention and any potential prejudice to the opposing party. The court did not abuse its discretion either by limiting intervention or by allowing intervention despite the advanced state of the litigation. See generally Banco Popular de Puerto Rico v. Greenblatt, 964 F.2d 1227, 1230-31 (1st Cir. 1992).

We also refuse to endorse a blanket rule, as John would have us do, that intervention is impermissible in Hague Convention cases. Though, as Jacqueline and Martha admit, not every Hague Convention case requires intervention on behalf of the children, there may be such

be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24.

-16-

cases (though we doubt very many). Given the circumstances, the court did not abuse its discretion in determining that intervention was warranted here.

The district court also did not abuse its discretion when it issued a stay pending appeal. John says that stays should not be allowed in Convention cases because the Convention envisions an expeditious procedure for the determination of claims. He also notes that other countries provide for the execution of an order for the return of a child during the pendency of a Hague Convention appeal. See Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, Held 18-21 January 1993, 33 I.L.M. 225, 232 (1994) (noting that an order may be enforced pending an appeal in Austria, France, Germany, Luxembourg, and the Netherlands). Finally, he points to a footnote in Friedrich v. Friedrich, 78 F.3d 1060, 1063 n.1 (6th Cir. 1996), in which the Sixth Circuit, in dicta, noted that "[s]taying the return of a child in an action under the Convention should hardly be a matter of course." While it is true that the process for the adjudication of Hague Convention petitions should be as quick as possible, see Hague Convention, art. 11, neither the Convention nor the U.S. implementing legislation restricts the appellate process. And so while we can imagine cases where a stay pending appeal would be improvident, John has offered no reason particular to this case why the

-17-

district court's stay was an abuse of discretion.

## III.

Jacqueline and Martha also contend that the district court should not have heard John's petition because he is a fugitive from justice. The district court declined to apply the fugitive disentitlement doctrine because: 1) there was no nexus between John's Hague Convention petition and his fugitive status; and 2) John has yet to be convicted. See Walsh II, 53 F. Supp. 2d at 94. Further, the court said it would be reluctant to apply the doctrine, even if it felt itself able, because the Massachusetts authorities had not initiated extradition proceedings against John. See id. at 95. We review the district court's legal conclusions de novo and its factual conclusions for clear error.

Jacqueline and Martha rely on Prevot v. Prevot, 59 F.3d 556 (6th Cir. 1995), in which the Sixth Circuit found that the district court should have dismissed a Hague Convention petition under the fugitive disentitlement doctrine. The Prevot court found that there was a nexus between the petitioner's fugitive status and his petition and concluded that the petitioner's "fugitivity, and his actions, constitute abuses to which a court should not accede." Id. at 567. To the extent Prevot turns on a per se rule, we disagree.

Fugitive disentitlement cases arise in three distinct procedural postures: 1) criminal and civil appeals brought by the

fugitive; 2) civil suits brought against the fugitive (e.g., civil forfeitures); 3) civil suits brought by the fugitive (e.g., § 1983 suits).  The Supreme Court has considered cases in the first two categories; ours is in the third.

Generally, courts will dismiss the civil or criminal appeal of a fugitive who is still on the lam.  See, e.g., Molinaro v. New Jersey, 396 U.S. 365, 365-66 (1970); United States v. Hanzlicek, 187 F.3d 1219, 1221 (10th Cir. 1999) (dismissing the criminal appeal of a defendant who failed to complete her term of supervised release); Parretti v. United States, 143 F.3d 508, 511 (9th Cir. 1998) (en banc) (dismissing the appeal of fugitive in a criminal case); United States v. Barnette, 129 F.3d 1179, 1186 (11th Cir. 1997) (dismissing the appeal of a fugitive couple who were found in civil contempt); Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 282 (2d Cir. 1997) (dismissing the appeal of a fugitive in a civil RICO case); United States v. Latigua-Bonilla, 83 F.3d 541, 542 (1st Cir. 1996) (dismissing the appeal of a defendant who failed to complete his term of supervised release).  Courts have also dismissed the appeals of fugitives who have not voluntarily surrendered after a certain period. See, e.g., Estelle v. Dorrough, 420 U.S. 534, 539 (1975) (upholding the constitutionality of a Texas statute that provided for automatic appellate dismissal when a defendant escapes during the pendency of the appeal, unless the fugitive returns voluntarily within ten days);

United States v. Puzzanghera, 820 F.2d 25, 27 (1st Cir. 1987) (holding that a fugitive who escaped while the appeal of his conviction was pending and was involuntarily returned to custody more than thirty days after his escape forfeited his right to appellate review). In Ortega-Rodriguez, the Supreme Court vacated the dismissal of a criminal appeal because the fugitive was recaptured before the appeal was made. See Ortega-Rodriguez v. United States, 507 U.S. 234, 251-52 (1993).

In Degen, the Supreme Court unanimously held that the disentitlement doctrine does not allow "a court in a civil forfeiture suit to enter judgment against a claimant because he is a fugitive from, or otherwise is resisting, a related criminal prosecution." Degen v. United States, 517 U.S. 820, 823-24 (1996); see also FDIC v. Pharaon, 178 F.3d 1159, 1162 (11th Cir. 1999) (reversing the trial court's striking of a defendant-fugitive's answer, citing Degen, and noting the absence of cases "applying or upholding the application of the . . . doctrine in a civil case to strike a defendant's answer and enter judgment against him"); United States v. Pole No. 3172, Hopkinton, 852 F.2d 636, 643-44 (1st Cir. 1988).

In Degen, where a civil suit was brought against a fugitive, the Court focused on the common underlying justifications for disentitlement, recognizing that their applicability will vary on a case-by-case basis. Thus, in Degen, the Supreme Court noted five asserted rationales for disentitlement in civil cases against a

fugitive: 1) the risk of delay or frustration in determining the merits of the claim; 2) the unenforceability of the judgment; 3) the compromising of a criminal case by the use of civil discovery mechanisms; 4) the indignity visited on the court; and 5) deterrence. See Degen, 517 U.S. at 825-28. Of these, the Court discounted rationale three (compromising a pending criminal case) because the district courts have methods less extreme than disentitlement for preventing this type of harm. The Degen Court also dismissed grounds four and five (indignity and deterrence) because "disentitlement is too blunt an instrument for advancing [those 'substantial' interests]." Id. at 828. As the Seventh Circuit concluded recently, Degen "shift[ed] the emphasis from considerations of dignity, deterrence, respect, propriety, and symmetry found in a number of earlier [fugitive disentitlement] cases to the kind of practical considerations that inform the decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct." Sarlund v. Anderson, 205 F.3d 973, 974 (7th Cir. 2000). Although the Supreme Court has not yet decided the issue, we think the same factors apply to civil cases where the fugitive is the plaintiff.

Thus, the Eleventh Circuit has held that "the dismissal of a civil action on fugitive disentitlement grounds requires that (1) the plaintiff is a fugitive; (2) his fugitive status has a connection to his civil action; and (3) the sanction employed by the district court,

-21-

dismissal, is necessary to effectuate the concerns underlying the fugitive disentitlement doctrine." Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998) (per curiam).  As we have seen, the relevant concerns underlying the doctrine include prejudice to the opponent, delay, frustration, and unenforceability.

We apply this test.  First, John is plainly a fugitive. Second, it is arguable that there is some connection between John's fugitive status and his petition.  While the petition is, of course, not connected in the classic sense of being part of the same criminal proceeding as to which the petitioner is a defendant, it is arguable that, but for John's having fled the United States, the pregnant Jacqueline would not have gone to Ireland with M.W. or given birth there to E.W., and thus there would have been no occasion to apply the treaty.[8]  See Prevot, 59 F.3d at 566-67.  That, though, may be too slim a reed to support so weighty a doctrine.  Third, an appreciation of the pragmatic concerns requires a case-by-case analysis.  In the usual civil case, the plaintiff or petitioner bears the burden of proof and his failure to appear may hamper his ability to meet his burden.  This case, however, turns largely on an issue as to which Jacqueline bears the burden of proof.  In such instances, it may be easier to find that

---

[8]     We disagree with the district court's conclusion that disentitlement cannot be applied in cases when the fugitive has yet to be convicted or when extradition has yet to be sought.  See Walsh II, 53 F. Supp. 2d at 94-95.  The concerns that underlie the doctrine may have force even in these circumstances.

the fugitive has prejudiced the opposing party.  Still, here, the fact that John was unavailable to testify may have hurt both sides, but, as John's counsel noted, it worked more to his disadvantage.[9]  See <u>Oretega-Rodriguez</u>, 507 U.S. at 249 (leaving open the possibility of applying the fugitive disentitlement doctrine on appeal to prevent actual prejudice to the government); <u>Sarlund</u>, 205 F.3d at 974 (applying the doctrine where the plaintiff's fugitive status created a situation severely prejudicial to his adversaries).

There are questions of enforceability of any potential judgment against John, as return orders under the Convention are often imposed with conditions, as was true here.  But all cases under the Convention raise similar problems since, by definition, one of the parties lives in a foreign jurisdiction.  Neither was the petition brought to harass Jacqueline.  The practical considerations, on these facts, are not strong enough alone to warrant application of the doctrine.

More importantly, applying the fugitive disentitlement doctrine would impose too severe a sanction in a case involving parental rights.  Parenthood is one of the greatest joys and privileges

_____

[9]     Prejudice may take many forms.  While depositions of persons in foreign nations may be available by legal process, the costs of such a procedure may be beyond the financial ability of the parties.  Here, neither John nor Jacqueline are persons of means and counsel in this litigation have largely acted <u>pro bono publico</u>.  Counsel here conducted discovery by agreement, and we see no prejudice.

-23-

of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children. See generally Troxel v. Granville, 120 S. Ct. 2054, 2060 (2000) (plurality opinion) ("The liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."). To bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh. It is too harsh particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent.

As the Supreme Court noted in Degen, while "[t]here would be a measure of rough justice in saying [that the fugitive] must take the bitter with the sweet, and participate in the District Court either for all purposes or none[, such] justice would be too rough." Degen, 517 U.S. at 829. It would be particularly rough when, as here, parental rights are at stake. To the extent this is a pure question of law, we hold that the fugitive disentitlement doctrine does not per se bar the petition and, on the facts here, we find that the doctrine does not apply.

**IV.**

Jacqueline and Martha also appeal the district court's grant of John's Hague Convention petition. Jacqueline, initially, conceded

that Ireland was the "habitual residence" of the children[10] and that her taking of them was "wrongful" under the Convention. See Hague Convention, arts. 3, 4; Toren v. Toren, 191 F.3d 23, 27 (1st Cir. 1999). The wrongful taking of a child from his or her country of habitual residence normally requires the child's return. See id. art. 12. The Convention, however, provides four exceptions to this general rule. See id. arts. 12, 13(a), 13(b), 20. Jacqueline relies on one of these: the Article 13(b) exception.[11]

> Article 13(b) provides:
>
> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13(b). The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610, the Convention's implementing legislation, provides that a respondent who opposes the return of the child by asserting the article 13(b) exception has the burden of proving this by clear and convincing evidence. See id.

---

[10] Martha belatedly attempted to challenge this claim, but was denied intervention as to it. We do not examine it further.

[11] Amici curiae National Network to End Domestic Violence, National Network to End Domestic Violence Fund, Massachusetts Citizens for Children, Massachusetts Society for the Prevention of Cruelty to Children, and Women Against Abuse, Inc. also raise a claim under article 20 of the Convention. We do not address the issue.

-25-

§ 11603(e)(2)(A). The exception is narrow. <u>See</u> <u>id.</u> § 11601(a)(4); <u>see</u> <u>also</u> Elisa Pérez-Vera, <u>Explanatory Report: Hague Conference on Private</u> <u>International Law</u>, <u>in</u> 3 Acts and Documents of the Fourteenth Session 426, at ¶ 34 (1980) (noting that "a systematic invocation of the [Convention's] exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration").

A. <u>Background</u>

The district court concluded that "the evidence does not reveal an immediate, serious threat to the children's physical safety that cannot be dealt with by the proper Irish authorities." <u>Walsh I</u>, 31 F. Supp. 2d at 206. As for article 13(b)'s psychological prong, the court found that "[e]ven if the various anxiety and stress related conditions with which [M.W.] has been diagnosed approach the severe harm contemplated by article 13b, to the extent that the children may be spared both separation from their mother and exposure to their parents' fighting, concerns for their psychological well being are largely mitigated." <u>Id.</u> The court concluded that "[d]espite the truly deplorable circumstances in which Jackie now finds herself, and in the face of her laudable concerns for her children, she has not established by clear and convincing evidence that her children face a grave risk of exposure to serious physical or psychological harm, nor that their

-26-

situation upon returning to Ireland will be intolerable." Id. at 207. The petition, the district court determined, must be granted and the children returned to Ireland.

Still, in order "to ensure that the children [would] be cared for properly during transit and that no harm will come to [them] pending disposition" of the custody proceedings in Ireland, the district court commendably "requested and received" a number of undertakings from John and Jacqueline:

> John is to provide for the transportation and escort of the children back to Ireland. Once the children reach Ireland, John is to provide adequate housing, clothing, medical care and serve as a parental figure for the children. If John cannot provide adequate housing and provisions then he must provide the Court a detailed description of how the Social Services authorities in Ireland will make these provisions. In either event, the Court is to be informed specifically what provisions are in place before the children will be ordered returned to Ireland.
>
> If Jackie determines to return to Ireland with the children, she must do so at her own expense. If she does return to Ireland, however, John must have no contact with her nor come within 10 miles of her residence, wherever she chooses to take up residence. Moreover, if Jackie returns to Ireland, John will have no contact with the children unless ordered by the authorities in Ireland. Each of these undertakings are conditions of this Court's order, and if any is violated, the order will be of no force and effect.

Id. (footnote omitted).

Relying on the district court's rulings, John's position on appeal is that the court correctly found there to be no grave risk of harm, for even if he may have beaten his wife (which he denies), he has

not beaten his children and any concerns on that point should be alleviated by his undertakings. Jacqueline's position is that the court applied too stringent a measure of harm, that the children have been and will be harmed by witnessing the assaults on their mother, that they are at grave risk of being assaulted themselves, and that John has already disregarded Irish court orders to stay away from the marital home and flouted the law, thereby making his undertakings worthless.

B. Analysis

We review the district court's factual findings for clear error and its interpretation of the Convention de novo. See Friedrich, 78 F.3d at 1064.

The district court's legal interpretations were in error, which led to error in its application of the law to the facts. The court raised the article 13(b) bar higher than the Convention requires. We set the bar at its proper height and find that Jacqueline has proven by clear and convincing evidence that the children face a grave risk of exposure to physical or psychological harm should they be returned to Ireland.

To begin, the district court erroneously required a showing of an "immediate, serious threat." Id. at 206; see also id. at 208 (concluding that "the Court [only] may act [under article 13(b)] to avert truly extraordinary threats to [the children's] health and

safety"). Article 13(b) of the Convention requires a showing that there be a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The Convention does not require that the risk be "immediate"; only that it be grave.

The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. See Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995).[12] Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. See Hague Convention, art. 1. For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented. Re A. (a Minor) (Abduction) [1988] 1 F.L.R. 365, 372 (Eng. C.A.); see also Friedrich, 78 F.3d at 1067-68; Re C. (Abduction: Grave Risk of Psychological Harm) [1999] 1 F.L.R. 1145 (Eng. C.A.); C. v. C. (Minor: Abduction: Rights of Custody Abroad) [1989] 1 F.L.R. 403, 410 (Eng. C.A.). Courts are not to engage in a custody determination,

_____

[12]    There is disagreement as to whether the "the physical or psychological harm contemplated by the first clause of Article 13(b) is harm to a degree that also amounts to an intolerable situation." Thomson v. Thomson [1994] 3 S.C.R. 551, 596 (Can.). The Supreme Court of Canada has said that it does. See id. We are doubtful about this.

so "[i]t is not relevant . . . who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home . . . and terminate her marriage." <u>Nunez-Escudero</u>, 58 F.3d at 377; <u>see also</u> Department of State, Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (1986) ("[Article 13(b)] was not intended to be used by defendants as a vehicle to litigate . . . the child's best interests."). We return to the issue of risk and harm, and how it applies to this case, below, but we first discuss the role that undertakings play in article 13(b) determinations.

A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings. Necessarily, the "grave risk" exception considers, inter alia, where and how a child is to be returned.[13] The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction. Given

---

[13] For example, it may pose a grave risk to send the child directly into the exclusive care of the other parent or to return to the child to the precise status quo ante, but it may not pose a grave risk to return the child to the country of habitual residence if the potential risks attendant upon a child's return are lessened or eliminated by the trustworthy undertakings of the parties.

the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm.  See, e.g., Blondin v. Dubois, 189 F.3d 240, 248 (2d Cir. 1999) (Blondin II); Turner v. Frowein, 752 A.2d 955 (Conn. 2000); Thomson v. Thomson [1994] 3 S.C.R. 551, 599 (Can.); P. v. B. [1994] 3 I.R. 507, 521 (Ir. S.C.).  See generally Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 156-72 (1999).

A good example of this approach is the Second Circuit's recent decision in Blondin II.  The district court had denied the father's petition to return the children to France because the mother had established that returning the children to their father's custody would pose a grave risk of harm.  See Blondin v. Dubois, 19 F. Supp. 2d 123, 127-29 (S.D.N.Y. 1998) (Blondin I).  The Court of Appeals vacated the district court's judgment and remanded the case to allow the district court to consider "remedies that would allow the children's safety to be protected [in France] pending a final adjudication of custody."  Blondin II, 189 F.3d at 250.

Yet, there may be times when there is no way to return a child, even with undertakings, without exposing him or her to grave risk.  Thus, on remand in Blondin, the district court found that the

-31-

"return of [the children] to France, under any arrangement, would present a 'grave risk'" because "removal . . . from their presently secure environment would interfere with their recovery from the trauma they suffered in France; . . . returning them to France, where they would encounter the uncertainties and pressures of custody proceedings, would cause them psychological harm; and . . . [one of the children] objects to being returned to France." Blondin v. Dubois, 78 F. Supp. 2d 283, 294 (S.D.N.Y. 2000) (Blondin III), appeal filed, No. 00-6066 (2d Cir. Jan. 20, 2000) (emphasis added).

Against this background, we consider this case. In our view, the district court committed several fundamental errors: it inappropriately discounted the grave risk of physical and psychological harm to children in cases of spousal abuse; it failed to credit John's more generalized pattern of violence, including violence directed at his own children; and it gave insufficient weight to John's chronic disobedience of court orders. The quantum here of risked harm, both physical and psychological, is high. There is ample evidence that John has been and can be extremely violent and that he cannot control his temper. There is a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife. These include John's threat to kill his neighbor in Malden, for which he was criminally charged, and his fight with his son Michael.

The district court distinguished these acts of violence

-32-

because they were not directed at M.W. and E.W.  See Walsh I, 31 F. Supp. 2d at 206-07.  Setting aside, for now, Jacqueline's allegations of John's direct physical and psychological abuse of the children, the district court's conclusions are in error, whatever the initial validity of the distinction.  First, John has demonstrated an uncontrollably violent temper, and his assaults have been bloody and severe.  His temper and assaults are not in the least lessened by the presence of his two youngest children, who have witnessed his assaults -- indeed, M.W. was forced by him to witness the aftermath of his assault on Michael.  Second, John has demonstrated that his violence knows not the bonds between parent and child or husband and wife, which should restrain such behavior.  Third, John has gotten into fights with persons much younger than he, as when he attempted to assault the young man in Malden.  Fourth, credible social science literature establishes that serial spousal abusers are also likely to be child abusers.  See, e.g., Jeffrey L. Edleson, The Overlap Between Child Maltreatment and Woman Battering, 5 Violence Against Women 134 (1999); Anne E. Appel & George W. Holden, The Co-Occurrence of Spouse and Physical Child Abuse: A Review and Appraisal, 12 J. Fam. Psychol. 578 (1998); Lee H. Bowker et al., On the Relationship Between Wife Beating and Child Abuse, in Kersti Yllo & Michele Bograd, Feminist Perspectives on Wife Abuse 158 (1988); Susan M. Ross, Risk of Physical Abuse to Children of Spouse Abusing Parents, 20 Child Abuse & Neglect 589 (1996).  But cf. Nunez-

-33-

Escudero, 58 F.3d at 376-77; K. v. K. [1997] 3 F.C.R. 207 (Eng. Fam.).

Fifth, both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser. Thus, a congressional resolution, passed in 1990, specifically found that:

> Whereas the effects of physical abuse of a spouse on children include . . . the potential for future harm where contact with the batterer continues;
>
> . . . .
>
> Whereas children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent;

H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990); see also Opinion of the Justices to the Senate, 691 N.E.2d 911, 917 n.5 (Mass. 1998); Custody of Vaughn, 664 N.E.2d 434, 439 (Mass. 1996). These factors are sufficient to make a threshold showing of grave risk of exposure to physical or psychological harm.[14]

The question remains whether John's undertakings, or even a potential barring order from the Irish courts, are sufficient to render any risk less than grave. John's undertakings require him to obey the orders of the district court and the courts of Ireland. We do not

---

[14] We disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal.

believe the undertakings received by the district court,[15] or even a potential barring order, are sufficient to protect the children from the exposure to grave risk in this case. We have no doubt that the Irish courts would issue appropriate protective orders. That is not the issue. The issue is John's history of violating orders issued by any court, Irish or American.

Courts, when confronted with a grave risk of physical harm, have allowed the return of a child to the country of habitual residence, provided sufficient protection was afforded. See, e.g., Re K. (Abduction: Child's Objections) [1995] 1 F.L.R. 977 (Eng. Fam.); N. v. N. (Abduction: Article 13 Defence) [1995] 1 F.L.R. 107 (Eng. Fam.); cf. Friedrich, 78 F.3d at 1069 (finding that the grave risk exception only applies when the child is in "danger prior to the resolution of the custody dispute -- e.g., returning the child to a zone of war, famine, or disease . . . [or when] there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable . . . to give the child adequate protection"). Such an approach has little chance of working here.

---

[15]    The district court attempted to reduce the potential harm by making its order self-executing. Thus, the court's order provided that it would be of no force and effect if any of the undertakings were violated. See Walsh I, 31 F. Supp. 2d at 207. As laudable as the attempt was, it necessarily falls short in this case, because the undertakings themselves are unlikely to be obeyed.

John's past acts clearly show that he thinks little of court orders. He has violated the orders of the courts of Massachusetts, and he has violated the orders of the courts of Ireland. There is every reason to believe that he will violate the undertakings he made to the district court in this case and any barring orders from the Irish courts.

Our conclusion here is similar to that of the English Court of Appeal in <u>Re F. (a Minor) (Abduction: Rights of Custody Abroad)</u> [1995] 3 All E.R. 641 (Eng. C.A.). In that case, the father, an American citizen, petitioned for the return of his son. <u>See</u> <u>id.</u> at 341. The father had abused the mother and was harsh with the son, including pinching his legs so hard as to leave bruises and other forms of abuse. <u>See</u> <u>id.</u> at 347. After the mother obtained a temporary restraining order, the father "engaged in a campaign of intimidation and harassment directed at the mother." <u>Id.</u> Granting the father's petition, the lower court held that the mother did not make out a case under article 13(b). <u>See</u> <u>id.</u> at 342. The Court of Appeal allowed the appeal (thus reversing the lower court). <u>See</u> <u>id.</u> at 352. The Court of Appeal was particularly concerned that the child would have been returned to the "very same surroundings and potentially the very same situation as that which has had such a serious effect upon him," and noted, in particular, that "[t]here has to be concern as to whether the father would take any notice of future orders of the court or comply with the undertakings he has given to the judge." <u>Id.</u> at 347-48.

-36-

While this case is not entirely one-sided,[16] we believe that the district court underestimated the risks to the children and overestimated the strength of the undertakings in this case. The article 13(b) exception must be applied and the petition must be dismissed.[17]

**V.**

We do not come to this conclusion lightly. International child abduction is a serious problem. See H.R. Con. Res. 293, 106th Cong. (2000). Further, a court's interpretation of a treaty will have consequences not only for the family immediately involved but also for the way in which other courts -- both here and abroad -- interpret the treaty. See United States v. Kin Hong, 110 F.3d 103, 106 (1st Cir. 1997); W. Michael Reisman, Necessary and Proper: Executive Competence to Interpret Treaties, 15 Yale J. Int'l L. 316, 325 (1990). In the United States, the vast majority of Hague Convention petitions result

_____

[16] The district court also found significant lapses on Jacqueline's part. See Walsh I, 31 F. Supp. 2d at 204.

[17] The Convention says that the return of the child is not mandatory if grave risk is shown. John correctly urges that the district court nonetheless has discretion to order the return. See Hague Convention, art. 18; Friedrich, 78 F.3d at 1067; Feder v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995). From this, John argues that the order should be upheld as a reasonable exercise of the district court's discretion. Plainly, though, this misdescribes the basis for the court's order. We have no reason to think that the district court would have ordered the return of the children had it found that Jacqueline had made an article 13(b) showing. Moreover, even if it had, on these facts, such an order would have been an abuse of discretion.

-37-

in the return of children to their country of habitual residence, and rightly so.  But the Convention provides for certain limited exceptions to this general rule.  The clearly established facts of this case -- including the father's flight after indictment for threatening to kill another person in a separate case and a documented history of violence and disregard for court orders going well beyond what one usually encounters even in bitter divorce and custody contexts -- lead us to conclude that this case fits within one of these.

The judgments of the district court are <u>affirmed in part</u> and <u>reversed in part</u> and the case is remanded with instructions that John's petition be dismissed.

So ordered.  No costs are awarded.