# United States Court of Appeals
## For the First Circuit

No. 10-2227

SAVVAS CHARALAMBOUS,

Petitioner, Appellee,

v.

ELIZABETH ROHNERT CHARALAMBOUS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Judy Potter for appellant.
David S. Abramson, with whom Adrianne E. Fouts was on brief,
for appellee.

December 8, 2010

**Per Curiam**.  Savvas Charalambous filed a petition for the return of his two children, A.C. and N.C., to Cyprus pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, which was implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 et seq.  The children were removed in June 2010 from Cyprus, their country of habitual residence, to the United States by their mother, Elizabeth R. Charalambous.  She did not return the children to Cyprus before September 2010 as she had represented she would.  She defended against the petition primarily on the ground that returning the children would expose them to a grave risk of harm, an exception to return under Article 13(b) of the Convention.

Following a two-day evidentiary hearing, the district court held that there was not clear and convincing evidence of a grave risk of harm to the children, and that the Convention required their return.  The court ordered the children placed in their father's custody no later than October 20, 2010--a date later postponed to November 2, 2010--and ordered certain interim conditions.  In an October 28, 2010 Order, this court stayed the removal of the children pending the outcome of respondent's appeal, but expedited the appeal.  The court heard oral argument on December 7, 2010.

We now lift the stay, and affirm, finding no error of law by the district court and holding that its findings and conclusions

-2-

are well supported.  We order that the children be placed in the custody of the father no later than December 9, 2010 at 12:00 p.m. for their return to Cyprus, and we return jurisdiction to the district court should any further orders be necessary to secure enforcement.

I.

We briefly summarize the facts that led to the present appeal, taking them from the record of proceedings before the district court.  We refer to the parents by their first names and to the children by their initials.

Savvas, a citizen of Cyprus, married Elizabeth, a citizen of the United States, in a civil ceremony in Virginia in 1996, and again in a religious ceremony in Cyprus in 1998.  The couple has resided in Limassol, Cyprus since December 1997, save for a few months in 2004 during which Elizabeth and Savvas briefly separated and Elizabeth returned on her own to her parents' home in Maine. They have two children: N.C., born in 2002, and A.C., born in 2008.

On June 18, 2010, Elizabeth, N.C. and A.C. departed Cyprus for a summer visit to Elizabeth's family in Maine. Elizabeth had purchased return tickets to Cyprus, and Savvas expected Elizabeth and the children to return in August 2010.

By July 2010, Savvas came to believe Elizabeth would not return to Cyprus with the children as planned, based on her failure to provide the children opportunities to speak to their father, the

infrequent nature of her communications with him, and what she said when she did communicate. These beliefs were confirmed when Elizabeth informed Savvas on July 23, 2010 that she and the children would not be returning as planned. Consequently, on July 26, 2010, Savvas filed an application for return of his children under the Hague Convention with the Central Authority in Cyprus. Savvas then filed a petition in the District of Maine on September 3, 2010, alleging that Elizabeth had wrongfully retained N.C. and A.C. in the United States, and seeking the return of the children to Cyprus pursuant to the Hague Convention and ICARA.

The district court promptly held an evidentiary hearing on October 6 and 7, 2010. Both Savvas and Elizabeth testified in person; the court heard evidence by video from other witnesses in Cyprus. On October 12, 2010, in a careful and sensitive opinion, the court entered its Findings of Fact and Conclusions of Law, granting Savvas's petition, and ordering the children returned to the custody of their father by October 20, 2010. See Charalambous v. Charalambous, No. 10-CV-375, 2010 WL 4115495, at *12 (D. Me. Oct. 12, 2010). The court concluded that Elizabeth had wrongfully retained the children in Maine and that Elizabeth had failed to prove either that Savvas had consented or acquiesced to the retention or that the children faced a grave risk of physical or

-4-

psychological harm if they were returned to Cyprus.[1] Id. at *9-11. We discuss the relevant findings in more detail in the next section.

The court also ordered that, until the return, Elizabeth not remove the children from the District of Maine without approval of the court, and that the parties "shall seek a determination as soon as possible from a court of competent jurisdiction in Cyprus regarding the custody, support, and visitation with respect to the children." Id. at *12. The court ordered the return of N.C.'s and A.C.'s passports upon receipt of an affidavit from either Savvas or Elizabeth that they would be used solely for the purpose of travel to Cyprus. Id. The court clarified that its order in no way precluded an independent custodial determination by an appropriate authority in Cyprus. Id.

On October 15, 2010, Elizabeth filed both a Motion to Stay the Judgment and a Motion to Extend Time Within Which to Turn Over Children so that she might pursue an appeal. On October 18, 2010, the district court denied Elizabeth's Motion to Stay, and granted the Motion to Extend Time. The court reset the deadline for Elizabeth to return N.C. and A.C. to Savvas to November 2, 2010.

---

[1] The court determined that Cyprus was the children's country of habitual residence.

This appeal followed, accompanied by an Emergency Motion to Stay Judgment of the District Court. We granted the Motion to Stay on October 28, 2010. That stay was modified and other conditions were imposed on the mother as a result of actions she unilaterally took during the pendency of the appeal.[2]

II.

We review the district court's interpretation of the Hague Convention de novo. Danaipour v. McLarey, 286 F.3d 1, 13

---

[2] On November 9, 2010, Savvas filed an Emergency Motion to Modify Stay in response to several incidents involving Elizabeth's treatment of A.C. and N.C., including her unilateral decision to have N.C. hospitalized for behavioral issues. The Motion sought reconsideration of our Order granting the stay, or, in the alternative, a modification of the stay to award Savvas complete temporary custody of the children until the stay is lifted. The Motion also requested (1) an order that each parent must confer with the other regarding decisions relating to medical treatment of the children, and (2) an order that neither party may initiate proceedings that would involve any custodial determination by any court.

Except for the request to modify the stay, we transferred all aspects of the Emergency Motion to the district court. The district court held a conference with counsel on November 15, 2010, and issued an order the same day, which concluded that Elizabeth's actions referenced in Savvas's Emergency Motion "appear to reflect a panicked parent seeking to avoid the then-pending November 2, 2010 turnover date." The district court granted the Emergency Motion in part, ordering that: (1) neither parent obtain medical or mental health treatment without notice to the other parent; (2) in the event that one of the children requires emergency medical care, the parent deciding to seek such care must notify the other parent within thirty minutes of the decision; (3) Savvas and Elizabeth have equal parental rights pending the outcome of the appeal; and (4) neither party may initiate proceedings that would involve any determination of custody while this matter remains pending. Finally, the court allowed Elizabeth to retain short-term custody of the children, but provided Savvas with specific visitation times. These conditions have remained in place pending the outcome of this appeal and have not been challenged.

(1st Cir. 2002).  We review the district court's findings of fact for clear error, and its application of the Convention to the facts de novo.  Id.

The Hague Convention was enacted to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, art. 1; see also Abbott v. Abbott, 130 S. Ct. 1983, 1989 (2010).  The Convention establishes a strong presumption favoring return of a wrongfully removed child, Danaipour, 286 F.3d at 13, and is "based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence," Abbott, 130 S. Ct. at 1995.  The Hague Convention is generally intended to restore the status quo before the removal and to prevent a parent from engaging in international forum shopping.  Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir. 2008).  We interpret the Convention's text mindful of these purposes.  Abbott, 130 S. Ct. at 1990.

Children who have been wrongfully retained outside of their country of habitual residence must be expeditiously returned, unless the respondent can prove one of the defenses provided for by the Convention.  Hague Convention, arts. 12-13.  In the district court, Elizabeth invoked the Article 13(b) defense that returning

-7-

N.C. and A.C. to Cyprus would create a "grave risk" of "physical or psychological harm" or "otherwise place the child[ren] in an intolerable situation." Id. at art. 13. Specifically, she alleged a grave risk of such harm existed based on the children having been physically, sexually or psychologically abused by Savvas and his mother. She also argued that returning to Cyprus would place her own safety at risk, thus causing her children psychological harm.[3] See Walsh v. Walsh, 221 F.3d 204, 220 (1st Cir. 2000). The district court rejected Elizabeth's argument based on its findings of fact.

On appeal, Elizabeth waives most of her claims and only pursues discrete portions of her grave risk defense. Specifically, Elizabeth has abandoned a primary claim she made to the district court: that N.C. or A.C. would be subject to physical harm in the form of sexual or other abuse upon their return to Cyprus. On appeal, Elizabeth has not contested the district court's findings on this point.[4]

---

[3]    Before the district court, Elizabeth also invoked the defense, which the court rejected, that Savvas "had consented to or subsequently acquiesced in the removal or retention" of the children in the United States. Hague Convention, art. 13(a).

[4]    In any event, the record firmly supports the district court's conclusions. Elizabeth had N.C. evaluated for sexual abuse in connection with these proceedings, but there was insufficient evidence to support any finding that N.C. was the victim of sexual abuse. Furthermore, Elizabeth admitted she had never complained about such abuse to anyone while in Cyprus. Neither N.C.'s teachers nor N.C.'s pediatrician saw any signs of abuse, nor did any of the family members. The district court's conclusions that

The only questions on appeal are (1) whether the district court erred in its interpretation of the Hague Convention concerning any psychological harm to the children that returning them to Cyprus could cause, and (2) whether it was clearly erroneous for the district court to conclude that Elizabeth had not demonstrated that any spousal abuse would create a grave risk to the children.

Under Article 13(b), "grave" means a more than serious risk, but it need not be an immediate risk. See Danaipour, 286 F.3d at 14 (citing Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)); Walsh, 221 F.3d at 218. Elizabeth bears the burden of establishing the existence of such a grave risk by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The district court's conclusion that she failed to meet her burden is not in error and is strongly supported by the record.

---

Elizabeth "has simply not established by any evidence that her Children were sexually abused by their Father or anyone else living in Cyprus" and that "both parents love their children and neither would or did sexually abuse them" are amply supported.

With respect to other abuse, the record reflects genuine and reasonable disagreements between Elizabeth and Savvas regarding proper methods of discipline; it does not reflect physical abuse rising to a level "a great deal more than minimal" as required to make a showing of grave risk. Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000).

A.          Psychological Harm

Elizabeth argues that the district court made an error of law and asserts that the court only considered physical harm, sexual abuse, and spousal abuse, and overlooked the question of "psychological harm," a term used in Article 13(b).

The argument flatly ignores the fact that the district court made an express finding that Elizabeth had failed to meet her burden of showing psychological harm: "Respondent has not shown by clear and convincing evidence that returning the Children to Cyprus will expose them to physical or psychological harm or otherwise place them in an intolerable situation." Charalambous, 2010 WL 4115495, at *8 (emphasis added); cf. Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (rejecting argument that the court overlooked psychological harm).

There was no error of law in the district court's organization of the subsidiary discussions of Elizabeth's Article 13(b) claims under the subject-headings "Sexual Abuse," "Physical Abuse," and "Spousal Abuse"; these were the central arguments she advanced. This organization does not betray a failure to consider the risk that returning the children to Cyprus would cause them psychological harm.

The district court was highly attuned to the psychological well-being of N.C. and A.C., and to the risks presented to the children's emotional well-being. The district

court also explicitly considered the forms of psychological harm that Elizabeth identifies: the risks that returning N.C. and A.C. to Cyprus might force them to witness future spousal abuse (they had not witnessed any before), or force their separation from their mother should Elizabeth choose not to return to Cyprus. The finding that she had failed to meet her burden of showing grave risk of psychological harm to the children is amply supported.

On appeal, Elizabeth also argues the district court failed to adequately consider the risk that, if returned to Cyprus, N.C. will be less likely to get the psychological treatment she believes he needs. She says that treatment is unavailable, citing that there are only three therapists specializing in the treatment of children in Limassol,[5] and that Savvas's extended family will prevent N.C. from obtaining the psychological services he requires.[6] The district court explicitly considered "the . . . evidence relating to the influence of the Charalambous family in Cyprus," and concluded that "the total weight of the evidence does not present a clear and convincing case of grave risk." Charalambous, 2010 WL 4115495, at *11. "The Article 13(b) defense

---

[5] The record contains no evidence as to other services that might be available in Cyprus outside of Limassol, including in the capital city of Nicosia. There are only Elizabeth's statements that she had "never come across a child psychologist" during her time in Cyprus and that there were no mental health programs in the private schools in which she worked as a teacher.

[6] It is not at all clear why the family would be motivated to deny psychological services if N.C. were in need of them.

may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour, 286 F.3d at 14 (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. at 10,510).

The Second Circuit's decision in Blondin v. Dubois, 238 F.3d 153 (2d Cir. 2001), does not help Elizabeth. That decision was based on a diagnosis that the children's post-traumatic stress disorder would recur if they were returned to their home country, id. at 160-61, not the relative availability of resources in each country. The court expressly rejected the argument, made here by Elizabeth, that the grave risk exception prevents "return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State."[7] Id. at 162 (quoting 51 Fed. Reg. at 10,510).

_____

[7] The court further explained:

In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001).

B.       Spousal Abuse

The relevant inquiry is not whether there would be a grave risk of harm to Elizabeth if she returned to Cyprus; rather, the grave risk inquiry goes to the children.  See Abbott, 130 S. Ct. at 1997 (noting that if respondent could demonstrate returning child to home country "would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm'"); Walsh, 221 F.3d at 220.  Elizabeth failed to draw a connection establishing, by clear and convincing evidence, that any risk to her constituted a grave risk to the children.

The district court found that "Elizabeth was subjected to some verbal and emotional abuse and that there was one incident of physical abuse" which "did not require any medical treatment."[8] The court further determined that "the record does not reflect that N.C. and A.C. have witnessed their father being abusive toward their mother."  In light of these findings,[9] the court reasoned it

_____

[8]    The district court made these findings having credited all of Elizabeth's testimony.  But the court noted that both Elizabeth and Savvas lacked credibility in certain respects.  The record also reflects that Elizabeth did not consider herself a victim of domestic abuse while in Cyprus and that she did not seek protection under Cyprus's domestic abuse laws. We do not enter the parties' dispute over the effectiveness of such laws.

[9]    There were inconsistencies between Elizabeth's testimony about her treatment by Savvas and her characterizations of him in an email dated March 8, 2010, an email Elizabeth testified was a mere exercise suggested by a marriage counselor they saw in Cyprus. Among other things in the e-mail, she said to him, "You treat me

could not conclude "the Children would suffer from psychological harm or be placed in an intolerable situation based on spousal abuse if they are returned."

Elizabeth argues the district court's findings are clearly erroneous. We disagree. The record supports the district court's conclusion that there was only one act of physical abuse, an incident in April 2010 in which Savvas braced Elizabeth against a wall during an argument and held his hand next to her face. Elizabeth does not specify any other incidents that the district court overlooked. The record also supports the district court's conclusion that neither N.C. nor A.C. witnessed any act of physical abuse, which further suggests the lack of grave risk to the children. Further, Elizabeth has avowed not to return to Cyprus due to her subjective personal fears; if she does not return that removes any risk of the children witnessing any future abusive acts in Cyprus.

In view of the district court's well supported findings, there is no grave risk to the children under Article 13(b) associated with any potential future abuse of their mother. Cf. Walsh, 221 F.3d at 209-12; see also Whallon, 230 F.3d at 460

---

very well," and "I can feel safe with you," and "I know you will never hurt me." She also said, "Whenever I ask for help, you are always there for me." As to the children and their father she said, "You are wonderfully connected to your children and you are very involved in their lives and upbringing," and "You are such a gentle and kind and loving father."

("[A]llegations of verbal abuse and an incident of physical shoving are distinct from the 'clear and long history of spousal abuse' presented in Walsh.").

Finally, Elizabeth argues that the district court failed to consider the impact that returning the children to Cyprus without their mother would have on them, given her stated choice to remain in the United States regardless. She focuses on evidence of the "extraordinary attachment" between the children and their mother.

The district court supportably found that Elizabeth's stated refusal to return to Cyprus was based upon "her subjective perception of a threat" that was "not corroborated by other evidence in the record." Charalambous, 2010 WL 4115495, at *11. Regardless, the court weighed the consequences of Elizabeth choosing not to return to Cyprus, and concluded that "the alternative of allowing these children to remain wrongfully retained in this country is equally likely to traumatize the children."[10] Id. at *12. Elizabeth offers no argument on appeal as to why that is not so. The district court correctly concluded that "the impact of any loss of contact with the Mother is something that must be resolved by the courts of the Children's habitual residence." Id.; see also Abbott, 130 S. Ct. at 1995. We

---

[10] Elizabeth admitted that in fact her relationship with N.C. in Cyprus was not as close as Savvas's relationship with N.C.

-15-

point out that Elizabeth is free, in the courts of Cyprus, to seek custody of the children and such other orders as may become necessary as to the children.

III.

We affirm the judgment entered by the district court on October 12, 2010. We find no error in the district court's Findings of Fact and Conclusions of Law, and we approve all aspects of the district court's orders pertaining to removal.

The respondent is ordered to return N.C. and A.C. to the petitioner no later than 12:00 p.m. on Thursday, December 9, 2010. The interim conditions imposed by the district court's November 15, 2010 Order remain in place until the children are removed from the United States. We return jurisdiction to the district court for any necessary enforcement orders.

Mandate to issue forthwith.

So ordered.